Daniel N. Shallman (Bar No. 180782)
Paulina Rafizadeh (Bar No. 348706)
Mathew A. Sperling (Bar No. 360266)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067-4643
Telephone: + 1 (424) 332-4800
dshallman@cov.com; prafizadeh@cov.com
msperling@cov.com

Marci L. Miller (Bar No. 162790)
Richard Rosen (*Pro Hac Vice Forthcoming*)
Jeffrey I. Lang (*Pro Hac Vice Forthcoming*)
Mollie Galchus (*Pro Hac Vice Forthcoming)*
THE LOUIS D. BRANDEIS CENTER FOR
HUMAN RIGHTS UNDER LAW
1776 I Street, NW
Washington, DC 20006
Telephone: + 1 (714) 299-7157
mmiller@brandeiscenter.com; rrosen@brandeiscenter.com;
jlang@brandeiscenter.com; mgalchus@brandeiscenter.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILSHIRE BOULEVARD TEMPLE and THE LOUIS D. BRANDEIS CENTER COALITION TO COMBAT ANTI-SEMITISM, INC. | Civil Case No.: 2:26-cv-7560 |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| TURTLE ISLAND LIBERATION FRONT LA, KOREATOWN 4 PALESTINE, PEOPLE'S CITY COUNCIL – LOS ANGELES, QUYEN BALLAGH, AUDREY ILLEENE CARROLL, RAY WUE CORPUS, JASON REEDY, and | **JURY TRIAL DEMANDED** |

JOHN DOES 1–40,

Defendants.

COMPLAINT

Plaintiffs Wilshire Boulevard Temple and The Louis D. Brandeis Center Coalition To Combat Anti-Semitism, Inc., for their complaint against Turtle Island Liberation Front LA, Koreatown 4 Palestine, People's City Council – Los Angeles (collectively, "Defendant Organizations"), Quyen Ballagh, Audrey Illeene Carroll, Ray Wue Corpus, Jason Reedy, and John Does 1–40, allege as follows:

**<u>INTRODUCTION</u>**

1.     This action arises out of a carefully conceived and coordinated attack on Jewish Angelenos and others exercising their First Amendment rights at the Wilshire Boulevard Temple on December 3, 2025.

2.     Wilshire Boulevard Temple ("the Temple"), an iconic Jewish house of worship in Los Angeles' Koreatown, agreed to host a symposium entitled Innovating Safety, Empowering Communities: A Symposium on AI and Public Safety, for the local Jewish and Korean-American communities, on December 3, 2025 (the "Symposium"). The Symposium sought to unite the local Jewish and Korean-American communities on a common issue of importance—protecting houses of worship and enhancing the public safety of two communities that had experienced increased incidents of hate crimes. For the Temple and its members, the Symposium was an opportunity to fulfill the fundamental Jewish obligation of *tikkun olam*—the duty of each Jew to strive to return the world to the harmonious state it was meant to attain by addressing injustice, helping the vulnerable, and fostering a more equitable and just society.

3.     The Symposium was sponsored by the Consulate General of Israel to the Pacific Southwest, in partnership with the Jewish Federation Community Security Initiative, Faith and Community Empowerment, and the Korean American Federation of Los Angeles. The program was to include remarks by an official representative of the Jewish Federation, an expert on artificial intelligence, a panel discussion featuring a Los Angeles police officer, an Israeli police officer, and a USC professor of public policy. In addition, Dr. Goni Saar of Elbit Systems, an Israeli tech company specializing in defense,

COMPLAINT

homeland security, and commercial applications, was to give a presentation on public safety AI tools.

4.     In advance of the Symposium, through social media and other campaigns, Defendant Organizations called on their followers and supporters, including Defendants Quyen Ballagh, Audrey Illeene Carroll, Ray Wue Corpus, Jason Reedy, and John Does 1–40, (collectively "Individual Defendants") to violently protest, disrupt and shut down the Symposium.

5.     Turtle Island Liberation Front LA ("TILF"), for example, issued a "CALL TO ACTION" for its approximately 1,112 Instagram followers to "JOIN US IN PROTEST AGAINST THESE GENOCIDAL MONSTERS."[1] TILF instructed its members to "WEAR BLOC," a militant tactic of wearing helmets, masks, goggles and dark clothing to battle law enforcement and prevent police identification. TILF's post included a well-known image that depicts violence against Jewish Israelis—a bloody handprint encircled by TILF's name, and the words "Liberation Front" spelled out in dripping blood letters. The bloody red hand image pays homage to the lynching of two Israeli military reservists in 2000, which at least one murderer celebrated by raising his hands, covered in the blood of the victims.[2]

6.     Defendant Koreatown 4 Palestine called out the "Zionist Event" at the Temple and directed its followers and supporters to "SHUT IT DOWN." Its post included the Symposium flyer but with the addition of an inverted red triangle—a well-known Hamas symbol used to intimidate and target Jews with violence. In addition, its post included a large red "X" across the entire page, making clear its intent to prevent the Symposium from taking place.

---

[1] Turtle Island Liberation Front LA, Instagram post (Dec. 2, 2025), https://www.instagram.com/p/DRxxoZzkjlH/.

[2] *Anti-Israel protesters' painted red hands a 'symbol' rooted in 'craze to see blood': expert*, Fox News (Apr. 9, 2024); *Oxford Union protesters accused of mimicking deaths of Israeli soldiers*, The Telegraph (Nov. 19, 2025), https://www.telegraph.co.uk/news/2025/11/19/oxford-union-protesters-accused-of-mimicking-deaths-of-isra/.

7.     The Symposium was scheduled on Wednesday, December 3, 2025, to start at 9:30 a.m. at the Temple's event space, the Audrey Irmas Pavilion ("Irmas Pavilion"). The Irmas Pavilion sits next to the Temple's sanctuary. The entire Temple campus is protected by a security perimeter, including gated entrances and a parking garage.

8.     On the morning of the Symposium, congregants, community members, and visitors encountered menacing masked individuals—Defendants—intent on obstructing access to the Temple and to shutting down the Symposium. Defendants, shouting hateful slurs and profanities, prevented congregants and community members from entering a house of worship. Many Symposium speakers and guests, to the extent Defendants did not succeed in preventing their entrance entirely, arrived late, delaying the start of the Symposium.

9.     Defendants did not merely obstruct access to the Temple. They unlawfully trespassed onto the Temple's Glazer campus and gained entry to the Irmas Pavilion, refusing directions to leave. Once inside, Defendants physically attacked security guards, harassed and intimidated the Temple's congregants and guests, and obstructed the Symposium and other Temple events and activities. Several Defendants registered for the Symposium under false pretenses and during the program staged seriatim disruptions, screaming at attendees. During one presentation, Defendant Corpus stood and threw a large vase to the floor, causing a loud crash that sent shards of glass flying across the room. He then screamed hateful slurs and profanities while physically charging at the Israeli Consul General, before being intercepted by security. Others stood on a patio just outside the room in which the Symposium was taking place and pounded on sliding glass doors. Defendants' unlawful actions ended only after the arrival of the Los Angeles Police Department, which arrested at least two Defendants. Defendant Corpus was charged with vandalism, and Defendant Ballagh was charged with battery.

10.     The December 3, 2025 attack on the Temple represents a dangerous escalation in anti-Semitic violence against Jewish houses of worship. Those responsible must be held accountable.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over Counts 1 to Counts 5 of this action under 28 U.S.C. § 1331 because these claims arise under federal law, and over Counts 6 to Counts 11 under 28 U.S.C. § 1367 because they are so related to Counts 1 to 5 that they form part of the same case or controversy.

12.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Wilshire Boulevard Temple is located in the Central District of California, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in the District.

## PARTIES

13.    Plaintiff Wilshire Boulevard Temple is a Jewish congregation and synagogue located in Los Angeles, California. It is the oldest synagogue in Los Angeles, receiving its formal charter from the State of California in 1862, and since then has grown to become one of the largest and most prominent congregations in Los Angeles. The Temple's Erika J. Glazer Family Campus ("Glazer campus") is the historic flagship site of the congregation.

14.    Plaintiff The Louis D. Brandeis Center Coalition to Combat Anti-Semitism, Inc. (the "Coalition") is a Virginia-incorporated, independent nonprofit membership organization, operating pursuant to Section 501(c)(3) of the Internal Revenue Code. As of the time of filing, it has over 400 members. The Coalition's mission is to advance the civil and human rights of the Jewish people and promote justice for all through the legal system, including litigation. The Coalition brings this action for the benefit of its members who were harmed by the unlawful actions of Defendants as described in this Complaint. The Coalition is entitled to bring this action for the benefit of its members who would otherwise be entitled to bring this suit in their own right, because the interests that the Coalition seeks to protect in this litigation are germane to its purpose, and neither the claims asserted nor the relief sought here are unique to the Coalition members and therefore do not require the participation of each Coalition member. The Coalition's

members include Temple members, parents of Wilshire Schools East students, and persons who attended or were obstructed from attending the Symposium.

15.     Coalition Member No. 1 is a citizen of the State of California and a resident of Los Angeles, California. Coalition Member No. 1 is Jewish and attended the Symposium.

16.     Coalition Member No. 2 is a citizen of the State of California and a resident of Los Angeles, California. Coalition Member No. 2 is Jewish and attended the Symposium.

17.     On information and belief, Defendant People's City Council – Los Angeles ("PCC") is an unincorporated association without a formal place of business. PCC, which describes itself as an anti-capitalist and anti-imperialist collective,[3] was created in or around March 2020 in Los Angeles, and continues to operate in Los Angeles.

18.     On information and belief, Defendant Turtle Island Liberation Front LA is an unincorporated association operating in Los Angeles, California. TILF advocates for violent resistance to government authorities and capitalist institutions.

19.     On information and belief, Defendant Koreatown 4 Palestine is an unincorporated association operating in Los Angeles, California.

20.     On information and belief, Defendant Quyen Ballagh is a resident of Los Angeles, and was arrested for battery for her actions at the Temple on December 3, 2025.

21.     On information and belief, Defendant Ray Corpus is a resident of Irvine, California, and was arrested for vandalism for his actions at the Temple on December 3, 2025.

22.     On information and belief, Defendant Audrey Illeene Carroll is a resident of Los Angeles, California, a leader of TILF, and participated in the December 3, 2025 protest. On information and belief, Carroll operates TILF's Instagram account and at all times herein acted within her scope and authority as a representative of TILF.

---

[3] Peoples City Council, Instagram bio, https://www.instagram.com/peoplescitycouncil/.

23.     On information and belief, Defendant Jason Reedy is a resident of Los Angeles, a leader of PCC, and participated in the December 3, 2025 protest. Reedy has a well-documented history of engaging in violent demonstrations, including assaulting a Los Angeles City Council member in his office, and obstructing and disrupting public and private events. On information and belief, at all times herein, Reedy acted within his scope and authority as a representative of PCC.

24.     Defendants John Does[4] 1 through 40 are individuals whose identities are not currently known and who entered into a conspiracy the purpose of which was to engage in the unlawful and tortious actions described below, and/or who, directly participated in the unlawful and tortious actions directed at the Temple and the other Plaintiffs on December 3, 2025.

## FACTUAL ALLEGATIONS

### A.     The Rise of Modern Day Anti-Semitism

25.     Anti-Semitism is one of the world's oldest and most enduring forms of hatred. It has persisted through the millennia, retaining common tropes while mutating according to the majority's prevailing ideologies. Where earlier forms of anti-Semitism scapegoated Jews for plagues and other societal evils, modern anti-Semitism often relies on the same logic—thinly disguised through references to Israel or "Zionists."

26.     A prominent modern form of anti-Semitism operates by denying any historical or religious connection between Jews and the land of Israel and by characterizing Israel, its Jewish citizens, and Jewish people everywhere, as the embodiment of evil. And it has become common in many settings to use the term "Zionist" as a code word for "Jew" and Israel as a proxy for Jews collectively, particularly when "Zionist" is used as a slur; e.g., when supporters of Israel's right to

---

[4] As used herein, the fictitious name John Doe is gender neutral.

exist and Jewish self-determination are demonized as "Zionist" monsters, accused of killing children, stealing land, and perpetrating racism.[5]

27.    Specifically, many of today's anti-Semites deny Jewish people's shared indigenous connection to Israel, despite both the historical continuous presence of Jews in Israel for millennia and the fact that connection to Israel is a fundamental tenet of Jewish faith for the vast majority of Jewish people. Jewish religious practice emphasizes Jews' ancestral, present, and future connection to the land of Israel. Jewish religious customs also emphasize the religious connection to the land of Israel. Familiar examples of such rituals include a bridegroom crushing a glass at the end of the wedding ceremony to symbolize and recall the destruction of the Temple in Jerusalem by the Roman Empire in 70 CE.  Passover seders often conclude with the refrain "next year in Jerusalem." Connection with the land of Israel is thus a matter of positive religious obligation for many Jews.

28.    For millions of Jews, and for the members of the Coalition, the belief in the land of Israel as the indigenous Jewish homeland is central not only to their Jewish ancestral identity but also to their sincerely held religious beliefs. For them, supporting Israel as the Jewish homeland is a sincerely held religious commitment. Some go to Israel not only to see family but also to pray and connect with the land that is essential to the Jewish people. Disavowing Israel's right to exist or disavowing Jewish ties to Israel diminishes and denigrates their core religious beliefs.

---

[5] *See, e.g.,* KENNETH L. MARCUS, THE DEFINITION OF ANTI-SEMITISM 175 (Oxford Univ. Press 2015). Sadly, this is nothing new: propagandists have for decades used the term "Zionist" or "zio" as code for "Jew." *See id*. What is new—and troubling—is that this bigoted discourse has become commonplace and serves to mask anti-Semitism. *See*, *e.g.*, Anti-Defamation League*, Anti-Zionism as Antisemitism: How Anti-Zionist Language from the Left and Right Vilifies Jews* (Apr. 4, 2023), https://www.adl.org/resources/article/anti-zionism-antisemitism-how-anti-zionist-language-left-and-right-vilifies-jews.

COMPLAINT

**B.    Jewish Houses of Worship Have Become Targets of Threats and Violent Attacks**

29.    On October 7, 2023, Hamas terrorists invaded Israel and murdered 1,200 men, women and children, and took approximately 250 hostages to Gaza. Hamas rampaged through kibbutzim (Jewish communes focused on equality and social justice) and the Nova music festival, attended mainly by young Israelis. It was a genocidal massacre that made no distinction between civilian and soldier, young or old, or supporter or opponent of the current Israeli government. Mere presence in the land of Israel, inside the 1967 borders, made individuals a target for execution or brutal captivity in the tunnels of Gaza. In the wake of the deadliest day in Jewish history since the Holocaust, the United States in general, and Los Angeles in particular, has experienced an alarming surge of anti-Semitism, including a dramatic increase in violent attacks on Jewish houses of worship.

30.    Since the October 7 attacks, the security risk to Jewish houses of worship and their congregants in the United States has sharply increased. According to an Anti-Defamation League audit of anti-Semitic incidents in the United States during 2024:

> Jewish organizations, particularly synagogues, were targeted with hundreds of bomb threats and hundreds more general antisemitic threats. Congregants were harassed and even assaulted while at or in the vicinity of Jewish institutions, and some anti-Israel groups escalated their tactics, protesting Jewish religious and cultural institutions on dozens of occasions. Incidents occurred in all 50 states and the District of Columbia. As in previous years, states and metropolitan areas with the largest Jewish populations continued to report the highest levels of incidents.[6]

During that year, there were 1,344 incidents in the State of California, second only to New York.

---

[6] ADL, Audit of Antisemitic Incidents 2024 (Apr. 22, 2025), available at https://www.adl.org/resources/report/audit-antisemitic-incidents-2024.

COMPLAINT

31.     The following are just a small sample of the threats and violence faced by Jewish houses of worship since October 7, 2023:

- June 23, 2024:  A mob of approximately 200 demonstrators shouting anti-Semitic threats blocked the entrance to Adas Torah synagogue in Los Angeles, and masked demonstrators physically assaulted congregants and sprayed chemical irritants.

- August 10, 2024:  An individual stabbed a Jewish congregant in the chest outside of a Brooklyn synagogue.

- October 4, 2024:  Multiple New York synagogues received bomb threats timed with the celebration of the Jewish High Holy Days, as announced in a warning issued by New York Governor Kathy Hochul.

- November 13, 2024:  After threatening violence, several organizations disrupted an event at a New Jersey synagogue, including through intimidation, obstruction, and physical assault of congregants, leading the Department of Justice to file a federal action under the Freedom of Access to Clinic Entrances Act (the "FACE Act"), 18 U.S.C. § 248.

- January 3, 2025:  An individual with an illegal cache of weapons who was planning attacks on synagogues while also inciting others to do the same was arrested by Massachusetts police.

- May 29, 2025:  An individual with a large cache of weapons who threatened to blow up a synagogue was arrested by Minnesota police.

- October 27, 2025:  An individual in possession of weapons, a suitcase of ammunition, and body armor who was planning attacks on multiple synagogues was arrested by the FBI and Alabama police.

- November 19, 2025:  Approximately 200 people staged a demonstration at the Park East Synagogue in New York, harassing and intimidating congregants trying to enter.

Those incidents are far from comprehensive. Moreover, they do not include the legion of threats and attacks on other Jewish individuals, institutions, and gatherings, including the

April 13, 2025 attempted assassination of Pennsylvania Governor Josh Shapiro in an arson attack on his home on the Passover holiday; the May 29, 2025 murder of a couple outside the Capital Jewish Museum in Washington, D.C.; and the June 1, 2025 Molotov cocktail attack in Boulder, Colorado on a gathering of Jews in support of hostages remaining in Gaza, which killed an 82-year-old Holocaust survivor.

32.     On June 5, 2025, the FBI and Department of Homeland Security issued a public service announcement warning the Jewish community to remain vigilant in light of increased serious threats to Jewish and Israeli communities from domestic and foreign violent extremists and would-be hate-crime perpetrators.

33.     Threats, attacks, and campaigns of harassment and intimidation have substantially burdened the rights of Jews in Los Angeles and throughout the United States to freely travel, assemble, and to live and practice their faith as guaranteed by the Constitution. According to data released by the Los Angeles County Hate Crimes Commission last December, 80% of all religiously motivated hate crimes in 2024—259 incidents—targeted the Jewish community. "According to the latest survey of Jewish Federations, Los Angeles Jews are twice as likely to be concerned for their public safety as the general public; that number doubles again for Jews who wear visible Jewish symbols (kippah, Star of David, etc.)."[7] Due to heightened security risks, Jewish houses of worship and other institutions have been forced to divert significant resources to enhance security protection, such as hiring security personnel and training volunteers, buying security systems, communications systems, magnetometers and other screening devices, installing reinforced doors and glass, and contributing to community security initiatives. According to Jewish Federations of North America, as of 2025, Jewish communities in the United States spend over $765 million annually to keep their

---

[7] N. Farkas, *The Jewish community must take action to ensure its own security*, Jewish Federation of Los Angeles (Dec. 2, 2024), available at https://www.jewishla.org/the-jewish-community-must-take-action-to-ensure-its-own-security-opinion/.

12
COMPLAINT

congregants and community members safe.[8] A typical Jewish organization spends 14% of its annual budget on security. The Temple is no exception. Due to its prominence, the Temple has been forced to allocate far greater resources to enhanced security protection than most synagogues.

34.    In addition to the staggering costs of enhanced security requirements, synagogues in Los Angeles and throughout the United States also rely on congregants to volunteer for training and service with community safety organizations to augment synagogue security and emergency responsiveness. The costs and resources diverted to necessary security measures effectively tax the rights of Jews to live and practice their faith.

35.    The heightened security risks do more than impose substantial burdens on resources. The threat of anti-Semitic attacks, harassment, and intimidation has sown apprehension and fear within the Jewish community, causing some Jewish congregants to avoid Jewish houses of worship and abstain from religious practice. According to the 2025 annual American Jewish Committee's *State of Anti-Semitism in America Report*, 30% of American Jews reported that a Jewish institution with which they are affiliated had been the target of anti-Semitism in the past five years, and a majority (56%) of American Jews reported changing their behavior out of fear of anti-Semitism.[9]

**C.    <u>The Temple Agrees to Host The Symposium</u>**

36.    The Temple agreed to host the Symposium at the Irmas Pavilion. The Temple rents space at the Irmas Pavilion for events and affairs that are consistent with the Temple's religious mission and values.

37.    In addition to the Irmas Pavilion, the Glazer campus also houses the sanctuary, the synagogue's offices and library, and is home to two Wilshire Boulevard

---

[8] Letter from E. Fingerhut to Members of the House Subcommittee on Counterterrorism and Intelligence (July 22, 2025), https://cdn.fedweb.org/fed-1/1/House%2520Subcommittee%2520Letter.pdf.

[9] American Jewish Committee, *The State of Antisemitism in America,* (Feb. 12, 2025).

Temple Jewish day schools, the Erika J. Glazer Early Childhood Center, and Brawerman East Elementary School (together, "Wilshire Schools East"), and the Karsh Family Social Service Center, which provides essential services to all people in need. Within Wilshire Schools East, the Temple's Early Childhood Center is "rooted in Jewish values."[10] Students at the Center "[c]elebrate Jewish holidays and traditions," "[l]earn Hebrew words and songs that bring Jewish life into the classroom," and "[p]ractice *tzedakah* (charitable giving) and *tikkun olam* (repairing the world)."[11] The Center's "curriculum integrates . . . [s]piritual and ethical growth through Jewish values, rituals, and traditions."[12] The Temple's Brawerman East Elementary School promotes "learning through a Jewish lens."[13] As part of the school's Hebrew & Judaic Studies curriculum, students study Torah, Jewish history, and Hebrew. Students also participate in *tefillah* (prayer), weekly Shabbat services, and religious holiday observances.

38.    The Glazer campus occupies the entire city block, and is protected by a common security barrier running along Wilshire, South Hobart, and South Harvard Boulevards. The security barrier has a single gated entrance to access the sanctuary and the Irmas Pavilion on Wilshire Boulevard. The image below shows the December 3, 2025 demonstrators blocking access to the sanctuary and the Irmas Pavilion. The sanctuary is on the left and the Irmas Pavilion is on the right, with the small courtyard between them. The hanging sign is in front of the entrance through the security barrier on Wilshire Boulevard.

---

[10] Wilshire Boulevard Temple Early Childhood Centers, *Early Childhood*, https://www.wbtecc.org/early-childhood (last visited July 1, 2026).

[11] Wilshire Boulevard Temple Early Childhood Centers, *About*, https://www.wbtecc.org/about (last visited July 1, 2026).

[12] *Id.*

[13] Wilshire Schools East, *Elementary*, https://www.wilshireschoolseast.org/elementary (last visited July 1, 2026).

COMPLAINT



In addition to the Wilshire Boulevard entrance, the sanctuary and the Irmas Pavilion may be accessed through the entrance to a private gated parking garage located on South Hobart Boulevard.

39.    The Symposium gathered together the local Jewish and Korean-American communities on a common issue of importance—enhancing the public safety of two communities that had experienced increased incidents of hate crimes,[14] and particularly to protect houses of worship. Due to security concerns, attendance at the Symposium was by invitation only. Each guest was required to register in advance and was advised that security officers would check identification at the door to confirm advance registration.

40.    The Temple agreed to host the event because, among other things, it furthered a core component of the Temple's religious mission, that of *tikkun olam*. At the Temple, *tikkun olam* is a foundational religious practice. As the Temple states on its website, "[w]e see *Tikkun Olam* not as an add-on, but a core expression of Jewish

---

[14] Asian Americans Advancing Justice reports that anti-Asian hate crimes "remain alarmingly elevated, more than double the pre-pandemic annual average from 2013-18." *2025 FBI Hate Crime Data Reveals Threats to Asian American Communities* (Apr. 23, 2026), https://www.advancingjustice-aajc.org/press-release/2025-fbi-hate-crime-data-reveals-threats-asian-american-communities.

identity."[15] The Temple and its members fulfill their commitment of *tikkun olam* through several Temple initiatives, including interfaith and civic engagement.[16]

41.     In a recent sermon, the Temple's Senior Rabbi Joel Nickerson explained the importance and scope of *tikkun olam* to Judaism and the Temple's community:

> Our vision of community extends beyond these walls to the larger Los Angeles community. The Karsh Family Social Service Center reflects our commitment to *tikkun olam*—repairing the world. As the Torah teaches, "You shall not oppress a stranger, for you know the feelings of the stranger, having yourselves been strangers in the land of Egypt." We must care for our neighbors, regardless of their background or faith. . . .
>
> *Tikkun olam* is not separate from our Jewish identity; it is its essence. Together, let's create a model of how a synagogue can not only enrich the lives of its members but also make a lasting impact on its city.

42.     The Temple sponsors opportunities for its members to fulfill the obligation of *tikkun olam* through community service. Among other things, congregants donate to and volunteer with the Temple's Karsh Family Social Service Center, which is located on the Glazer campus and provides essential social services and resources to the Temple's neighbors in need. In addition, the Temple's food pantry has fed the hungry in Los Angeles for over two decades.

43.     For the Temple and many of its members, the Symposium reflected another opportunity to fulfill the Jewish obligation of *tikkun olam*—to join together with Koreatown neighbors to enhance public safety and empower their common community.

44.     Rabbi Nickerson invoked the religious obligation of *tikkun olam* in his opening statement at the start of the Symposium and taught that the Symposium was an exercise of Jewish religious practice. He explained that the Jewish teaching, *kol Yisrael arevim zeh bazeh*, a Hebrew phrase which means "we are responsible for one another," is

---

[15] Wilshire Boulevard Temple, *Tikkun Olam*, https://www.wbtla.org/getting-involved/tikkun-olam (last visited July 1, 2026).

[16] *Id.*

not confined to "Jews caring for Jews" but "understanding that my well-being is tied to yours, and yours to mine."

### D.  Defendant Organizations Have Engaged in a Pattern of Violence and Intimidation, Including Threatening Jews and Attacking Jewish Institutions

45.    Defendant Organizations have a record of advocating, inciting, and engaging in violent actions, threats of force, intimidation and obstruction.

46.    Defendant People's City Council has a history of pursuing its ideological aims through aggressive and disruptive agitation, violent protests, and confrontations with police, fire, and other municipal authorities. Shortly after its founding, PCC raised over $1.2 million to post bail for jailed members and to purchase helmets, goggles, and masks to armor its members for violent demonstrations, confirming its intent to engage in violent and unlawful action. PCC encourages its supporters to wear "bloc" to demonstrations in order to maintain anonymity and avoid arrest for criminal activities. As detailed above, bloc (also referred to as "black bloc") is a militant tactic of wearing dark clothing, masks, hats or helmets, scarves, goggles or sunglasses, and other items as protective gear in anticipation of violent confrontation and to conceal identity to avoid possible prosecution. As PCC explained in an October 9, 2024 social media post on its Instagram account celebrating protestors who, in "homage to" the October 7, 2023 Hamas terrorist attacks on Israel, occupied and vandalized a Claremont College building: "They were all masked/bloc-ed up and escaped without arrest, several exiting through open windows on the second floor. (No face, no case!)."[17]

47.    PCC has repeatedly urged its members and followers to commit acts of violence. For example, in advance of a coordinated December 12, 2025 protest against the presence of U.S. Immigration and Customs Enforcement officials in Los Angeles,

---

[17] Peoples City Council, Instagram post (Oct. 9, 2024), https://www.instagram.com/p/DA7bprwpPAF/?img_index=1.

PCC posted on its social media sites: "Enough with the 'peaceful protest' chants please . . . the cops are shooting at you and beating you either way."

48.    PCC also employs a well-honed strategy for staging demonstrations that are intended to, and often succeed in, obstructing and disrupting constitutionally protected public and private events. For example, on its social media sites, PCC issued instructions to its followers for obstructing events through "staggered disruptions": "Pop off in different parts of the room… Make it difficult to carry on."[18] As further detailed below, that is exactly the strategy defendants employed at the Symposium on December 3, 2025.

49.    PCC in particular has a record of targeting Jewish houses of worship and community institutions in Los Angeles for violent demonstrations that intimidate and obstruct Jewish Angelenos from gathering with fellow congregants and practicing their faith. For example:

- On November 8, 2023, PCC organized a violent protest against the Los Angeles Museum of Tolerance, which hosted a screening of *Bearing Witness to the October 7th Massacre*, a documentary about the Hamas atrocities. While attendees inside wept, a masked mob outside raged, trying to block access to the documentary and assaulting Jewish community members gathered outside. PCC organized the protest and explicitly urged its members to stage a confrontation: "If people are passionate to show up and shut s–t down, they should. Make sure to mask up. 'No justice, no peace' means that."

- On June 23, 2024, PCC organized the above-referenced violent protest that targeted the Adas Torah synagogue in Pico-Robertson, blocking traffic as well as the entrance to the synagogue, shouting hateful chants to disrupt worshippers, and physically assaulting Jewish community members. President Biden spoke out in response to the violence: "I'm appalled by the scenes outside of Adas Torah

---

[18] Jaime Paige, '*F- ICE, F– LAPD!': LA's radical protestors behind synagogue firestorm*, N.Y. Post (Dec. 5, 2025), https://nypost.com/2025/12/05/us-news/the-radical-la-activists-who-targeted-a-synagogue-event/.

synagogue in Los Angeles. Intimidating Jewish congregants is dangerous, unconscionable, antisemitic, and un-American. Americans have a right to peaceful protest. But blocking access to a house of worship – and engaging in violence – is never acceptable."[19]

50.     Defendant Reedy is a leader of PCC and architect of its intimidation tactics. Reedy endorses violence to achieve his ideological goals. His social media account on X, @AxumSelassie, includes an inverted red triangle, the well-known symbol of Hamas and its violent campaigns against Jews. On October 25, 2025, just weeks before the December 3, 2025 Symposium, Reedy reposted a tribute to deceased Hamas leader Yahya Sinwar, which identified Sinwar as "the mastermind of the Flood"—Hamas' code name for the October 7, 2023 terrorist attacks against Israeli civilians. He also has a long and documented history of obstruction and disruption, including of Los Angeles City Council meetings and Police Commission hearings, often with an infant child strapped to his chest. And he succeeds in obstructing events. As public reporting on Reedy's activities explains: "Meetings collapse into disorder. Commissioners lose control. Police clear activists out. Reedy refuses to sit, refuses to quiet down, refuses to play by rules he doesn't accept."[20]

51.     According to the United States Department of Justice ("DOJ"), Defendant TILF advocates violent action to achieve its aims, which include liberating what it deems to be colonized lands, particularly the United States and the State of Israel. TILF also calls for the working class to rise up and fight back against capitalism. TILF asserts that liberalism and peaceful protest will be the downfall of people who believe it is enough, and that "direct action is the only way." In an Instagram post on November 28, 2025,

[19] Jill Cowan and Jonathan Wolfe, *Biden and Democratic Leaders Condemn Protest Outside L.A. Synagogue as Antisemitic*, N.Y. Times (June 24, 2024) Biden and Democratic Leaders Condemn Protest Outside L.A. Synagogue as Antisemitic - The New York Times.

[20] Jamie Paige, *F- ICE, F– LAPD!': LA's radical protestors behind synagogue firestorm*, N.Y. Post (Dec. 5, 2025), https://nypost.com/2025/12/05/us-news/the-radical-la-activists-who-targeted-a-synagogue-event/.

TILF urged, "Revolution is the only way. Stop 'peaceful protest[ing]. Rise up, fight back. We are not outnumbered, they are. Organize and be ready."[21]

52.     On December 15, 2025, DOJ announced that federal and state law enforcement authorities prevented TILF from carrying out a series of bombings against multiple targets in California beginning on New Year's Eve. Federal authorities arrested four TILF members while they tested explosives in the Mojave desert. According to DOJ, the arrests disrupted a dangerous conspiracy to spread fear and terror across Southern California and the United States, as well as future attacks targeting federal officers.[22]

53.     Defendant Audrey Illeene Carroll is a leader of TILF and operates TILF's @turtleislandliberationfrontla Instagram account, which publicly posts content advocating violence to achieve TILF's aims. On information and belief, Carroll authorized the December 2, 2025 post on TILF's Instagram account threatening force of violence at the Irmas Pavilion on the Temple's campus on December 3. Furthermore, Defendant Carroll personally participated in the demonstration at the Irmas Pavilion. DOJ alleges that Carroll led TILF's plot to conduct a series of bombings against multiple targets in California on New Year's Eve. Federal law enforcement arrested Defendant Carroll before the bombings could be carried out.

**E.      Defendant Organizations Engaged in a Plot to Obstruct the Symposium Through Threat of Force, Intimidation, Harassment and Trespass**

54.     On December 2, 2025, Defendant TILF issued a "Call to Action" to its more than 1,000 Instagram followers to prevent the Symposium from proceeding as scheduled the following day, and which threatened the use of force to meet its aim. On information

---

[21] Turtle Island Liberation Front LA, Instagram post (Nov. 25, 2025), https://www.instagram.com/p/DRmOj1Ukcj8/.

[22] Press Release, *Four Defendants Arrested for Alleged Anti-Capitalist and Anti-Government Plot to Bomb U.S. Companies on New Year's Eve,* U.S. Dep't of Just. (Dec. 15, 2025), https://www.justice.gov/opa/pr/four-defendants-arrested-alleged-anti-capitalist-and-anti-government-plot-bomb-us-companies; United States v. Carroll, et al., Criminal Complaint (C.D. Cal. Dec 13, 2025), https://docs.house.gov/meetings/JU/JU00/20260122/118881/HHRG-119-JU00-20260122-SD003-U3.pdf.

and belief, Defendant Carroll authorized the "Call to Action." It urged followers to meet at the Temple campus the following day at 9:00 a.m. The Call to Action described Elbit Systems as "BLOODY WAR CRIMINALS" and falsely reported that Elbit Systems was "planning to install their AI into the Koreatown neighborhood of Los Angeles." The purpose of the Call to Action was crystal clear: "WE CANNOT ALLOW THIS. Join us in protest against these GENOCIDAL MONSTERS."[23] TILF's post added, "These genocidal war criminals have no place in our city, and no place in Palestine. Never let them live in peace."[24]

55.    TILF's Call to Action included a bloody handprint logo, which is a gruesome tribute to violence against Jews and Israelis. The bloody handprint symbol originates from the October 12, 2000 lynching of two Israelis who, while trying to drive to Jerusalem, inadvertently turned onto a road leading to Ramallah, West Bank. After Palestinian police took them into custody, a mob forced its way into the police station and beat the two Israelis to death. In the jubilation that followed the murders, one of the killers celebrated his part by thrusting his bloody hands out of a police station window for the cheering crowd below to see. The bloody hand then became a popular symbol in support of cruelty and violence against Jews and Israelis.




TILF Call to Action logo                The murderer celebrating in Ramallah

---

[23] Turtle Island Liberation Front LA, Instagram post (Dec. 2, 2025), https://www.instagram.com/turtleislandliberationfrontla/p/DRxxoZzkjlH/.

[24] *Id.*

56.     TILF's Call to Action urged its followers to "wear bloc." TILF's use of the bloody hand logo, its direction to followers to "wear bloc," and its call to never let Symposium attendees live in peace signaled its intent to engage in violent action and constituted a threat of force.

57.     On December 2, 2025, PCC, through its People's City Propaganda Instagram account, issued a call to supporters to mass in front of the Temple on December 3, 2025 at 8:00 a.m.—an hour and a half before the scheduled start of the Symposium—and shut the Symposium down. That same day, PCC reposted the call to action on its own X account and urged its 91,000 followers to shut down "THIS Z1ONIST [sic] CONSULATE EVENT. BRING YOUR NOISEMAKERS. LET'S SHUT THIS DOWN!!!"[25] In light of its history of anti-Semitic harassment and advocacy for violent confrontation, PCC's call to "SHUT THIS DOWN" was a direct threat of force against the Temple.

58.     On December 2, 2025, Koreatown 4 Palestine, through its koreatown4palestine Instagram account, issued the following call to its followers: "ZIONIST EVENT FEATURING WEAPONS MANUFACTURER ELBIT SYSTEMS. ALL OUT TO 3643 WILSHIRE BLVD DECEMBER 3rd AT 8 AM–??? SHUT IT DOWN. SHUT IT DOWN. SHUT IT DOWN. SHUT IT DOWN." and "SHAME ON KAFLA [Korean American Federation of Los Angeles] FOR SPONSORING THIS GENOCIDAL EVENT. KAF CUT YOUR TIES WITH TERROR AND GENOCIDE." The caption of the same post also directed its followers: "ALL OUT TO AUDREY IRMAS PAVILION, WEDNESDAY DECEMBER 3RD / 8 AM. SHAME ON KAFLA FOR SPONSORING THIS Z10NIST [sic] CONSULATE EVENT."[26] The post featured the Symposium's promotional poster, crossed out with a large X. A red triangle, a symbol

---

[25] People's City Propaganda, X post (Dec. 2, 2025), https://x.com/PplsCityProp/status/1995895168214708666.

[26] *Id.*

of Hamas, was added to the top of the poster, reflecting Koreatown 4 Palestine's support for violent action against the Symposium and its attendees. The use of red triangles in anti-Israel activism originates from Hamas's propaganda videos, where it is used to mark enemy targets before an attack.



59. On information and belief, Defendants agreed, conspired, and coordinated on their plan to disrupt the Symposium, including by unlawfully obstructing entrances to the Temple, by intimidating Symposium attendees, the Temple's community members, and Coalition members, by staggered disruption of the Symposium, and by destruction of the Temple's property.

## F. The Attack on the Temple

60. The Temple scheduled the Symposium to start at 9:30 a.m. on December 3, 2025, at the Irmas Pavilion in a glass-walled meeting space, with sliding glass doors opening to a patio.

61.    At approximately 9:00 a.m., Defendants, their faces obscured by masks and carrying signs and bullhorns, massed in front of the Temple's security gate on Wilshire Boulevard. They formed a human barricade obstructing the entrance to the Temple, waving signs, shouting, among other things, "intifada" and various curses. Defendants confronted congregants, guests, and other community members, obstructing their access to the Temple, and preventing people already within the Temple from leaving.

62.    At about 9:15 a.m., a group of approximately 30 Defendants relocated to the Temple's private gated parking garage on South Hobart Boulevard to obstruct that entrance to the Temple. Defendants stood in front of the gate, encircled cars and yelled profanities, and caused passengers to reasonably fear for their physical safety.

63.    Coalition Member No. 1, alone in her car, was surrounded by approximately 10 masked Defendants shouting, among other things, "genocide is going on here" and "baby killers." But Coalition Member No. 1 was eventually able to inch her car ahead until she finally accessed the parking garage.

64.    After Coalition Member No. 1 passed into the Temple's garage, Defendants tightened their formation, preventing as many as 40 cars from entering into the Temple's parking garage. Although police officers on the scene instructed Defendants to disperse, they refused and continued to occupy the entrance to the Temple's parking garage for approximately 45 minutes. Several parents were trying to take their children to Wilshire Schools East, but they and their children were trapped in their cars, refused entry by Defendants, and blocked from behind by the growing line of cars trying to enter the parking garage. During that time, Defendants screamed hateful slurs and profanities at the parents and their children. When they finally dispersed, those Defendants joined their fellow conspirators at the Wilshire Boulevard entrance.

65.    Congregants, Symposium attendees, and other Temple affiliates trying to enter the Temple through its Wilshire Boulevard pedestrian entrance were also confronted by masked demonstrators obstructing access. Defendants used bullhorns to amplify profanities and hateful slurs which could be heard throughout the Glazer campus.

Defendant John Doe No. 1 positioned himself at the gate, swinging a large urn of incense from a chain, which caused the security desk and beyond to fill with smoke and odor.

66.   Defendants physically accosted the parent of a child enrolled in Wilshire Schools East and threatened "to fuck [him] up." As Coalition Member No. 2 tried to enter the Temple, a group of about 15 masked Defendants confronted her and obstructed her access while shouting "Zionist pigs," and "you're a baby killer."

67.   The threat posed by the demonstrators was not confined to the Symposium or the Irmas Pavilion; it impacted all of the Temple's activities. In order to protect the safety of students and teachers, Wilshire Schools East invoked safety protocols, including closing ingress and egress, requiring teachers and schoolchildren to remain in their classrooms for the remainder of the school day, and prohibiting anyone from entering or leaving the premises (including parents and caregivers). Once the Temple implemented its safety protocols, parents and children arriving to school could not enter.

68.   The start of the Symposium was delayed as demonstrators obstructed the arrival of speakers and guests. Several Jewish leaders, including Rabbi Nickerson, were present, along with approximately 70 to 80 attendees, including Coalition Member No. 1 and Coalition Member No. 2.

69.   After the Symposium finally started, Defendants carried out their premeditated and carefully coordinated plan to disrupt it. Defendants followed PCC's playbook for disrupting events: "That's how it's done—staggered disruptions so you all don't get kicked out at the same time. You can pop off in different parts of the room and extend the disruption. Make it difficult to carry on."[27] At least four Defendants registered for the program, not with the intention of attending and participating in the program, but to obstruct, disrupt, and intimidate those in attendance and other people within the Temple. Defendants sat among attendees in different areas of the room and engaged in

---

[27] People's City Council, X post (Jan. 23, 2024), https://x.com/PplsCityCouncil/status/1749930733672821066.

seriatim disruptions during one of the Symposium's presentations. The outbursts occurred without warning. In the middle of a presentation, a defendant seated among attendees would suddenly jump to their feet, shouting threats and obscenities, which not only were shocking in that instance but caused attendees to fear the prospect of other, more violent disruptions.

70.    As the first speaker of the Symposium concluded his presentation, Defendants Carroll and John Doe No. 1 jumped to their feet, unfurled a Palestinian flag and began screaming, among other things, "genocide" and "baby killer." Security escorted them off the Glazer campus. As they passed Rabbi Nickerson, Defendant Carroll shouted "fuck you" in his face and stared at him. The photo below shows security removing Defendants Carroll and John Doe No. 1 from the Irmas Pavilion, with the sanctuary just across the walkway.



71.    Defendant John Doe No. 2 sat among attendees in the middle of the room with a toddler in a stroller beside her. The child was in distress, and cried for 20 to 30 minutes, disrupting the program. On information and belief, Defendant Reedy is the father of the child in the stroller and knowingly used his child to create a disturbance. Reedy regularly obstructs events, including City Council meetings and Police

Department hearings with his children in tow, and exploits his children both to insulate himself from security and to disrupt proceedings.[28]

72.    Later in the Symposium, Defendant Corpus, seated along the side of the room, stood, grabbed a large glass vase containing a floral arrangement and threw it to the ground. Coalition Member No. 1, who sat in the middle of the room, feared an explosion of some kind, and saw glass shards flying from the side of the room. Glass shards nearly hit Coalition Member No. 2's leg. Defendant Corpus immediately charged the Consulate General at the front of the room, screaming hateful slurs and obscenities including "genocide," "terrorists," "baby killers," "suck my cock" and "fuck you." The Consulate security guards intercepted Corpus. Corpus fell toward the podium but kept getting back up and screaming, and in the process, kicked over a sound system, damaging a speaker and the flooring. The attendees jumped to their feet—many frightened that others in the room may be violent—and a number of people looked for exits. Authorities later arrested Corpus and charged him with vandalism.

73.    As security removed Corpus, Defendant Ballagh, who also had infiltrated the Symposium, began shouting and recording the security guards removing Corpus from the room. Seconds later, Ballagh burst back into the room, and shouted, among other things, "genocide" and "baby killers." Security guards removed Ballagh from the room. Authorities later arrested Ballagh and charged her with battery of a security guard.

74.    In addition to the disruptions during the Symposium, various John Doe defendants trespassed in the halls of the Irmas Pavilion. In the image below, Defendant Corpus is shown stalking the hallway just outside the glass walled meeting room where the Symposium was taking place:

---

[28] Jamie Paige, *LAPD meeting descends into chaos again as Rick Caruso slams commission: 'weakness and incompetency,'* N.Y. Post (Feb. 3, 2026), https://nypost.com/2026/02/03/us-news/lapd-meeting-again-descends-into-chaos-as-slur-slinging-protestors-shout-down-top-commissioner/; *Inside the warped world of LA's most vile protestor – hiding behind his kids as he bashes cops and hurls racist slurs*, N.Y. Post (Jan. 28, 2026), https://nypost.com/2026/01/28/us-news/inside-the-warped-world-of-las-most-vile-protestor-hiding-behind-his-kids-as-he-bashes-cops-and-hurls-racist-slurs/.

COMPLAINT



Defendants' actions disrupted the Symposium and sowed anxiety throughout the Temple. Because of that concern, Coalition members and others limited their activities within, or hastened their departure from, the Temple.

75.    Defendant Reedy appeared on the patio just outside the room in which the Symposium took place and began to scream and pound on the glass sliding doors to the room. Reedy, with an infant strapped to his chest and another child in a stroller, shouted at attendees while stalking along the glass doors and surrounding glass walls. Both children appeared in distress, crying loudly:

 

76. As a direct result of the access obstructions and security risks caused by their wrongful conduct, Defendants forced the Temple to close the Karsh Family Social Service Center (the "Karsh Center"). As a result, Defendants denied Karsh Center volunteers the opportunity to pursue community service and demonstrate their religious commitment to *tikkun olam*. Karsh Center volunteers provide critical services to community members in need, including preparation and distribution of diaper bags of childcare essentials to families, staffing the Karsh Center food pantry, which packs and distributes 750 to 900 bags of groceries to community members facing food insecurity, and collection of donated groceries from the Santa Monica Farmers Market.

77. Coalition Member No. 2 feared for her physical safety and felt compelled to leave the Symposium early. As she left, demonstrators still patrolled the entrance. She has not returned to the Temple because of her experience that day.

78. Coalition Member No. 1 felt trapped in the room. She was frightened to remain in the room, anxious that demonstrators intent on committing violence might still be in the room. But with Defendants menacing conduct from the other side of the glass doors, and other Defendants potentially infiltrating Temple property, she remained too frightened to leave. She stayed until the end of the Symposium and left only after a police officer assured her that the Los Angeles Police Department ("LAPD") had arrived and secured the grounds.

## COUNT I

**(Conspiracy to Intimidate and Interfere with First Amendment Right of Religious Freedom at Place of Religious Worship Through Threat of Force in Violation of 18 U.S.C. § 248(a)(2))**

**(On Behalf of Wilshire Boulevard Temple and the Coalition)**

**Against All Defendants**

79. Plaintiffs reallege and incorporate all prior paragraphs of this Complaint as if fully set forth herein.

80.     The Freedom of Access to Clinic Entrances Act (the "FACE Act"), 18 U.S.C. § 248, imposes civil and criminal penalties on any person who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." 18 U.S.C. § 248(a)(2).

81.     Under the FACE Act, the term "intimidate" means to place a person in reasonable apprehension of bodily harm to him- or herself or to another. 18 U.S.C. § 248(e)(3).

82.     Under the FACE Act, the term "interfere with" means to restrict a person's freedom of movement. 18 U.S.C. § 248(e)(2).

83.     Under the FACE Act, the term "physical obstruction" means rendering impassable ingress to or egress from a place of religious worship, or rendering passage to or from such a facility or place of religious worship unreasonably difficult or hazardous. 18 U.S.C. § 248(e)(4).

84.     The FACE Act authorizes a private right of action to be brought "by [any] person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship or by the entity that owns or operates such place of religious worship." *Id*. § 248(c)(1)(A).

85.     The term "threat of force" as used in the FACE Act means a statement which, in the entire context and under all the circumstances, a reasonable person would foresee would be interpreted by those to whom the statement is communicated as a serious expression of intent to inflict bodily harm upon that person. A threatening statement that violates the FACE Act is unprotected under the First Amendment.

86.     Plaintiff Wilshire Boulevard Temple is a place of religious worship for purposes of the FACE Act. *Id*. § 248(a)(2). The Temple has been serving the Los Angeles Jewish community since its founding in 1862, when it became the city's first synagogue. At its historic location, the Temple has for generations been a center for Jewish

spirituality and celebration, a place for lifelong learning, and a home for an engaged congregation of Jewish congregants, guests, and visitors to practice the Jewish faith.

87.    The Temple regularly hosts, among other things, individual and congregational prayer services, pastoral services, religious lifecycle events, Jewish day schools, and religious classes. Many of those and other religious events and services take place simultaneously. In addition, Jewish congregants and visitors regularly use the Temple's library and study halls for individual, partner, and small-group religious study and reflection.

88.    On the morning of December 3, 2025, the Temple hosted the Symposium.

89.    At the same time, the Temple's Jewish day schools were in session. The Irmas Pavilion's library and study halls were open for individual and partnered Jewish learning and reflection. In addition, the sanctuary adjacent to the Irmas Pavilion was open for prayer and reflection.

90.    Prior to and during the events at the Temple on December 3, 2025, Defendant Organizations conspired to so frighten, harass and intimidate Plaintiffs, through threat of force, as to prevent them from exercising their faith and participating in Jewish life at the Temple.

91.    Individual Defendants, through their actions including blocking the entrances to the Temple, shouting slurs and violent language, vandalism and the destruction of property, restricted the freedom of movement of Coalition members, the Temple's community members, and Symposium attendees and placed them in reasonable apprehension of bodily harm.

92.    Plaintiff Wilshire Boulevard Temple is entitled to compensatory damages, statutory damages, and punitive damages in an amount to be determined by the Court, and both Plaintiffs are entitled to preliminary and permanent injunctive relief to protect them from the likelihood of continuing violations of their rights under the FACE Act.

## COUNT II

**(Obstruction, Intimidation and Interference with First Amendment**

**Right of Religious Freedom at Place of Religious Worship**

**in Violation of 18 U.S.C. § 248(a)(2))**

**(On Behalf of Wilshire Boulevard Temple and the Coalition)**

**Against All Defendants**

93.     Plaintiffs reallege and incorporate all prior paragraphs of this Complaint as if fully set forth herein.

94.     The Freedom of Access to Clinic Entrances Act (the "FACE Act"), 18 U.S.C. § 248, imposes civil and criminal penalties on any person who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." 18 U.S.C. § 248(a)(2).

95.     Under the FACE Act, the term "intimidate" means to place a person in reasonable apprehension of bodily harm to him- or herself or to another. 18 U.S.C. § 248(e)(3).

96.     Under the FACE Act, the term "interfere with" means to restrict a person's freedom of movement. 18 U.S.C. § 248(e)(2).

97.     Under the FACE Act, the term "physical obstruction" means rendering impassable ingress to or egress from a place of religious worship, or rendering passage to or from such a facility or place of religious worship unreasonably difficult or hazardous. 18 U.S.C. § 248(e)(4).

98.     The FACE Act authorizes a private right of action to be brought "by [any] person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship or by the entity that owns or operates such place of religious worship." *Id*. § 248(c)(1)(A).

COMPLAINT

99.     Defendants conspired to disrupt the activities taking place at the Temple on December 3, 2025, and to threaten, obstruct, intimidate and interfere with people who were seeking to exercise their faith and participate in Jewish life at the Temple.

100.    Defendants, and those acting pursuant to actual or apparent authority or otherwise on their behalf, employed threats of force and physical obstruction to intimidate and interfere with Plaintiffs, the First Amendment rights of religious freedom of the Temple's congregants, families of students, and guests, including Coalition members.

101.    Starting at approximately 8:00 a.m., as Jews attempted to enter the Temple—whether for the Symposium, the Jewish day schools, or individual Jewish study or prayer—they were met by a crowd of Defendants, most masked to obscure their identities and frighten people attempting to enter the Temple. Defendants, and those acting pursuant to actual or apparent authority or otherwise on their behalf, gathered at the entrances to the Temple, forming a human barrier to entry, while chanting anti-Semitic calls to violence and preventing people from entering or exiting.

102.    The Defendants threatened force, obstructed, intimidated and interfered with congregants, community members and guests who were seeking to exercise their First Amendment rights of religious freedom at Wilshire Boulevard Temple, a house of worship.

103.    The Defendants threatened force, obstructed, intimidated and interfered with congregants, community members and guests who were seeking to attend the Symposium in pursuit of fulfilling the religious obligation of *tikkun olam*.

104.    In addition, the Temple operates a Jewish early-childhood school and a Jewish elementary school on the Glazer campus. Jewish parents choose to send their children to the Temple's schools specifically to gain a Jewish religious education. The Temple's Early Childhood Center offers a nurturing environment infused with Jewish values and teaches young children the foundations of the Jewish faith through, among other things, Shabbat celebrations, holiday rituals, and Hebrew songs. The Temple's

Brawerman East Elementary School includes weekly *tefillah*, or prayer, and teaches children deeper connections to their faith and heritage. Its Judaic Studies program emphasizes Jewish values and Israel education and, in weekly learning blocks, teaches students about Jewish holidays, the Torah and other Jewish texts, underlying values, and how to develop their Jewish identity.

105.   Jewish parents have a constitutional right to freely practice their faith, which includes raising and educating their children consistent with their faith. These children, in turn, also have a constitutional right to learn about and practice their faith, including the right to pray with their teachers and classmates. Jewish parents who enrolled their children in a Jewish day school, and who had intended to take their children to school to learn about their faith, instead witnessed the hostile mob gathered at the entrance, and fearing for their safety, abandoned their plan to enter Wilshire Schools East. Parents who attempted to enter the Temple were confronted by Defendants, their co-conspirators, and followers, who shouted anti-Semitic slurs at them, physically confronted and stalked them, and prevented them from entering the Temple. Some were able to access the Temple only through a private side door around the building of which Defendants, their co-conspirators, and followers, on information and belief, were unaware.

106.   The protest forced Wilshire Schools East to invoke safety protocols to protect Jewish students and their families, including closing access to the school and confining children to classrooms. Once the safety protocols were exercised, Jewish parents and children were not permitted to enter Wilshire Schools East, and children inside were not permitted to leave.

107.   Defendants' actions had the foreseeable effect of intimidating Jewish congregants, guests, and visitors, and preventing them from accessing the Temple to practice their faith.

108.   Each of Defendants' actions, by force, threat of force, or by physical obstruction, intentionally injured, intimidated, or interfered with Plaintiffs' freedom to exercise their religion thereby causing them harm.

COMPLAINT

109.   Defendants, and those acting pursuant to actual or apparent authority or otherwise on their behalf, employed threats of force and physical obstruction at the Temple to intimidate or interfere with Plaintiffs, Coalition members, congregants and guests of the Temple who were seeking to exercise their First Amendment rights of religious freedom.

110.   Defendant Organizations, and those acting on their behalf, knowingly engaged in acts intended to incite Individual Defendants to obstruct, intimidate and interfere with Plaintiffs, Coalition members, congregants and guests of the Temple who were seeking to exercise their First Amendment rights of religious freedom.

111.   Individual Defendants acted pursuant to Defendant Organizations' express instructions to "Shut it Down," which constituted express or implied actual authority to act on behalf of Defendant Organizations.

112.   Alternatively, Individual Defendants acted on apparent authority of Defendant Organizations and undertook to threaten, harass, intimidate, and physically obstruct the entrance to the Temple on behalf of Defendant Organizations.

113.   Each Defendant Organization is vicariously liable for the actions of its leaders, organizers, and Individual Defendants who were acting as agents or under apparent authority of such Defendant Organization.

114.   Plaintiff Wilshire Boulevard Temple is entitled to compensatory damages, statutory damages, and punitive damages in an amount to be determined by the Court, and both Plaintiffs are entitled to preliminary and permanent injunctive relief to protect them from the likelihood of continuing violations of their rights under the FACE Act.

## COUNT III

**(Intentional Damage and Destruction of Property of a Place of Religious Worship in Violation of 18 U.S.C. § 248(a)(3))**

**(On Behalf of Wilshire Boulevard Temple)**

**Against All Defendants**

COMPLAINT

115. Plaintiff Wilshire Boulevard Temple realleges and incorporates all prior paragraphs of this Complaint as if fully set forth herein.

116. The FACE Act imposes civil and criminal liability on any person who intentionally damages or destroys the property of a place of religious worship. 18 U.S.C. § 248(a)(3).

117. Defendants, and those acting pursuant to actual or apparent authority or otherwise on their behalf, intentionally damaged and destroyed Temple property, including a glass vase that was purposefully thrown to the ground and loudly shattered during the Symposium with the intent and effect of obstructing the program and frightening people within the Temple, as well as a sound speaker and the meeting room flooring.

118. Each Defendant Organization is vicariously liable for the actions of its leaders, organizers, and Individual Defendants who were acting as agents or apparent authority of such Defendant Organization.

119. Each Defendant conspired to damage and destroy Temple property in order to disrupt the Symposium. Defendants agreed or instructed that property damage would be used as a method of disruption.

120. The Temple is entitled to compensatory damages, statutory damages, and punitive damages in an amount to be determined by the Court, and to preliminary and permanent injunctive relief to protect them from the likelihood of continuing violations of its rights under the FACE Act.

## COUNT IV

### (Conspiracy to Deprive Civil Rights in Violation of 42 U.S.C. § 1985(3))

### (On Behalf of Wilshire Boulevard Temple and the Coalition)

### Against All Defendants

121. Plaintiffs reallege and incorporate all prior paragraphs of this Complaint as if fully set forth herein.

COMPLAINT

122. Section 1985(3) prohibits two or more persons from conspiring or going in disguise on the premises of another "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."

123. Section 1985(3) provides a private right of action where any person does, or causes to be done, "any act in furtherance of the object of such conspiracy, whereby another [individual] is injured [by] his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States." 42 U.S.C. § 1985(3).

124. Defendants agreed to, coordinated, and executed a common plan to deprive, directly and indirectly, the equal protection of the laws, and equal privileges and immunities under the laws, for a targeted class consisting of Jews and their allies.

125. Defendant Organizations collaborated on and coordinated their social media calls to action issued to their supporters. For example, each of Defendant PCC and Defendant Koreatown 4 Palestine issued the same December 2, 2025 social media posts calling on their followers to shut down the Symposium, and "liked" the other's post.

126. Defendants were motivated by invidious discrimination against Jews and their allies. This conspiracy was borne of anti-Semitic animus.

127. As set forth in the paragraphs above, Defendants repeatedly engaged in overt acts in furtherance of this conspiracy, the purpose of which was to violate the rights of Jews and people whose national and ethnic identity are inseparable from the indigenous roots of the Jewish people in the land of Israel, and the Jewish people's right to self-determination in their homeland.

128. Defendants, motivated by perceptions that the non-Jews present at the Temple were supporters of Jews, also conspired to violate the rights of those non-Jewish individuals.

129. Defendants and their co-conspirators engaged in express, overt, and illegal acts, pursuant to an unlawful conspiracy, in order to discriminate against Jewish people, and in so doing, to deprive them of their rights to the equal protection of the laws and

their rights to the equal enjoyment of the privileges and immunities of citizens of the United States.

130. As set forth in the paragraphs above, some of the known acts undertaken by Defendants and other co-conspirators in furtherance of the conspiracy include, intimidation, assault, trespass, destruction of property, and other violent acts.

131. As a direct and proximate result of the overt acts in furtherance of this conspiracy, as set forth in the above paragraphs, the Temple and members of the Coalition were discriminatorily deprived of one or more of its rights or privileges guaranteed by the Constitution or federal statutes. These rights include, but are not limited to, freedom of movement and the right to be free from racial and religious violence.

132. As against the Temple, Defendants' discriminatory deprivation of said rights was motivated by the Temple's position as a center of Jewish communal and religious life, and its support for the Jewish people's right to self-determination in the land of Israel.

133. As a direct and proximate result of the overt acts in furtherance of this conspiracy, as set forth in the above paragraphs, the Temple suffered injury to its property and/or was discriminatorily deprived of one or more of its rights or privileges guaranteed by the Constitution or federal statutes.

134. As a direct and proximate result of the overt acts in furtherance of this conspiracy, as set forth in the above paragraphs, the Coalition members were deprived of one or more of their rights or privileges guaranteed by the Constitution or federal statutes.

135. As a direct and proximate result of Defendants' conspiracy and conduct, Plaintiffs have suffered injury.

136. Plaintiff Wilshire Boulevard Temple is entitled to compensatory damages, statutory damages, and punitive damages in an amount to be determined by the Court, and both Plaintiffs are entitled to preliminary and permanent injunctive relief to protect

them from the likelihood of continuing violations of their rights under 42 U.S.C. § 1985(3).

## COUNT V

**(Denial of Full and Equal Benefits of Law on Account of Race**

**in Violation of 42 U.S.C. § 1981)**

**(On Behalf of Wilshire Boulevard Temple and the Coalition)**

**Against All Defendants**

137.   Plaintiffs reallege and incorporate all prior paragraphs of this Complaint as if fully set forth herein.

138.   Section 1981 protects against nongovernmental discrimination based on race that impairs the rights of persons "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property."

139.   The Jewish people constitute a race within the meaning of Section 1981.

140.   Defendants, and those acting pursuant to actual or apparent authority or otherwise on their behalf, trespassed on the Temple's real property, and damaged, destroyed, and vandalized the Temple's personal property. Defendants engaged in those actions because the Temple is a Jewish house of worship and is affiliated with the Jewish people.

141.   Defendants' actions, and the actions of those acting on Defendants' behalf, violated California Penal Code §§ 594 (vandalism), 594.3 (vandalism of a place of worship), 423.2(a) (intentional damage to or destruction of property of a place of religious worship), and 602 (trespass), and California common law prohibiting trespass.

142.   Defendants therefore injured the security of the Temple's property in violation of California law on account of race.

143.   Defendants and those acting on their behalf physically assaulted, harassed and intimidated Coalition members. Defendants engaged in those actions because Coalition members are Jewish.

COMPLAINT

144. Defendants' actions violated California Penal Code §§ 240 (assault), 242 (battery), and 422.6 (interference with civil rights by force, threat of force, or destruction of property because of the victim's actual or perceived religion, race, or national origin), and California common law prohibiting assault and battery.

145. Defendants therefore injured the security of Plaintiffs in violation of California law on account of race.

146. Defendants denied Plaintiffs the full and equal benefit of all laws and proceedings for the security of persons and property based on anti-Semitic racial animus.

147. Each Defendant Organization is vicariously liable for the actions of Individual Defendants who were acting as agents or apparent authority of such Defendant Organization.

148. As a direct and proximate result of the Defendants' denial of the full and equal benefit of all laws and proceedings for the security of persons and property, Plaintiffs have suffered injury.

149. Plaintiff Wilshire Boulevard Temple is entitled to compensatory damages, statutory damages, and punitive damages in an amount to be determined by the Court, and both Plaintiffs are entitled to preliminary and permanent injunctive relief to protect them from the likelihood of continuing violations of their rights under 42 U.S.C. § 1981.

**COUNT VI**

**(Intimidation and Interference with First Amendment Right of**

**Religious Freedom at Place of Religious Worship Through Threat of Force and**

**Physical Obstruction that is a Crime of Violence in Violation of**

**California Penal Code § 423.2(b))**

**(On Behalf of Wilshire Boulevard Temple and the Coalition)**

**Against All Defendants**

150. Plaintiffs reallege and incorporate all prior paragraphs of this Complaint as if fully set forth herein.

40

COMPLAINT

151.   The California Freedom of Access to Clinic and Church Entrances Act (the "CA FACCE Act"), Cal. Penal Code § 423.2(b) imposes criminal and civil liability on any person who "[b]y force, threat of force, or physical obstruction that is a crime of violence, intentionally injures, intimidates, interferes with, or attempts to injure, intimidate, or interfere with a person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship."

152.   The term "crime of violence" is defined to mean "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another." Cal. Penal Code § 423.1(a).

153.   The term "interfere with" is defined to mean "to restrict a person's freedom of movement." Cal. Penal Code § 423.1(b).

154.   The term "intimidate" is defined to mean "to place a person in reasonable apprehension of bodily harm to themselves or to another." Cal. Penal Code § 423.1(c).

155.   The term "physical obstruction" is defined to mean "rendering ingress to or egress…to or from a place of religious worship impassable to another person, or rendering passage to or from…a place of religious worship unreasonably difficult or hazardous to another person." Cal. Penal Code § 423.1(e).

156.   California Penal Code Section 423.4 provides that "[a] person aggrieved by a violation of Section 423.2 may bring a civil action to enjoin the violation, for compensatory and punitive damages, and for the costs of suit and reasonable fees for attorneys and expert witnesses."

157.   Defendants' actions, by force, threat of force, and physical obstruction that is a crime of violence, intentionally injured, intimidated, and interfered with Plaintiffs' lawful exercise or attempts to lawfully exercise, the First Amendment right of religious freedom at a place of religious worship.

158.   Each Defendant Organization is vicariously liable for the actions of its leaders, organizers, and Individual Defendants who were acting as agents or under apparent authority of such Defendant Organization.

159. Each Defendant agreed and conspired to interfere with and intimidate—by force, threat of force, and physical obstruction—persons, including students and congregation members of the Temple and Coalition members from exercising their First Amendment right of religious freedom.

160. Plaintiff Wilshire Boulevard Temple is entitled to compensatory damages, statutory damages, and punitive damages in an amount to be determined by the Court, and both Plaintiffs are entitled to preliminary and permanent injunctive relief to protect them from the likelihood of continuing violations of its rights under the FACCE Act.

## COUNT VII

**(Intimidation and Interference with First Amendment Right of Religious Freedom at Place of Religious Worship Through Nonviolent Physical Obstruction in Violation of California Penal Code § 423.2(d))**

**(On Behalf of Wilshire Boulevard Temple and the Coalition)**

**Against All Defendants**

161. Plaintiffs reallege and incorporate all prior paragraphs of this Complaint as if fully set forth herein.

162. The CA FACCE Act imposes criminal and civil liability on any person who by nonviolent physical obstruction, intentionally injures, intimidates, or interferes with, or attempts to injure, intimidate, or interfere with, a person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship.

163. The term "nonviolent" means conduct that would not constitute a crime of violence.

164. Defendants' actions, by nonviolent physical obstruction, intentionally injured, intimidated, and interfered with Plaintiffs' lawful exercise or attempts to lawfully exercise the First Amendment right of religious freedom at a place of religious worship.

165. Each Defendant Organization is vicariously liable for the actions of its leaders, organizers, and Individual Defendants who were acting as agents or under apparent authority of such Defendant Organization.

166. Each Defendant agreed and conspired to interfere with and intimidate—by nonviolent physical obstruction—persons, including students and congregation members of the Temple and Coalition members from exercising their First Amendment right of religious freedom.

167. Plaintiff Wilshire Boulevard Temple is entitled to compensatory damages, statutory damages, and punitive damages in an amount to be determined by the Court, and both Plaintiffs are entitled to preliminary and permanent injunctive relief to protect them from the likelihood of continuing violations of its rights under the FACCE Act.

## COUNT VIII

**(Intentional Damage or Destruction of Property of a Place of Religious Worship in Violation of California Penal Code § 423)**

**(On Behalf of Wilshire Boulevard Temple)**

**Against All Defendants**

168. Plaintiffs reallege and incorporate all prior paragraphs of this Complaint as if fully set forth herein.

169. The CA FACCE Act imposes criminal and civil liability on any person who intentionally damages or destroys the property of a place of religious worship.

170. Defendants, and those acting on their behalf, intentionally damaged and destroyed Temple property, including a glass vase that was purposefully thrown to the ground and loudly shattered during the Symposium in order to obstruct the program and frighten people within the Temple.

171. Each Defendant Organization is vicariously liable for the actions of its leaders, organizers, and Individual Defendants who were acting as agents or apparent authority of such Defendant Organization.

COMPLAINT

172. Each Defendant agreed and conspired to damage or destroy the property of the Temple.

173. The Temple is entitled to compensatory damages, statutory damages, and punitive damages in an amount to be determined by the Court, and to preliminary and permanent injunctive relief to protect it from the likelihood of continuing violations of its rights under the FACCE Act.

## COUNT IX

**(Interference with Exercise and Enjoyment of Rights in Violation of**

**Ralph Civil Rights Act of 1976, California Civil Code § 51.7, *et seq*)**

**(On Behalf of Wilshire Boulevard Temple and the Coalition)**

**Against All Defendants**.

174. Plaintiffs reallege and incorporate all prior paragraphs of this Complaint as if fully set forth herein.

175. The Ralph Civil Rights Act of 1976 guarantees all persons within the State of California the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property on the basis of political affiliation, or on account of any actual or perceived protected characteristic including those listed in Cal. Civ. Code § 51(b) and (e). Section 51(b) lists the following protected characteristics: sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status.

176. Section 51(e) states that the protected characteristics of sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status include any of the following:

a.   Any combination of those characteristics.

b.     A perception that the person has any particular characteristic or characteristics within the listed categories or any combination of those characteristics.

c.     A perception that the person is associated with a person who has, or is perceived to have, any particular characteristic or characteristics, or any combination of characteristics, within the listed categories.

Cal. Civ. Code § 51(e)(7).

177.    Section 51(e) defines "religion" to include all aspects of religious belief, observance, and practice. Section 51.7 moreover adds that the identification of particular bases of discrimination in Section 51(b) and (e) is illustrative rather than restrictive.

178.    Section 51.7 defines the term "intimidation by threat of violence" as including, but not limited to, terrorizing the owner or occupant of private property with the distribution of materials on the private property, without authorization, with the purpose of terrorizing the owner or occupant of that private property.

179.    Section 51.7 defines the term "terrorize" to mean to cause a person of ordinary emotions and sensibilities to fear for personal safety.

180.    While speech alone is not sufficient to support a private right of action under the Ralph Civil Rights Act of 1976, the following elements support a private right of action:

a.     Speech that threatens violence against a specific person or group of persons;

b.     The person or group of persons against whom the threat is directed reasonably fears that, because of the speech, violence will be committed against them or their property;

c.     The person threatening violence is acting with reckless disregard for the threatening nature of their speech; and

d.     The person threatening violence has the apparent ability to carry out the threat.

Cal. Civ. Code § 51.7(e)(1).

45

COMPLAINT

181.   Any person who denies a right provided by the Ralph Civil Rights Act of 1976, or aids, incites, or conspires in that denial, is liable for each and every offense for the actual damages suffered by any person denied that right, as well as exemplary damages, a civil penalty of $25,000 and attorneys' fees.

182.   Defendants and those acting on their behalf engaged in violence and intimidation by threat of violence against Wilshire Boulevard Temple and Coalition members because of their Jewish faith and shared ancestry, and/or their support for the State of Israel, and/or their perceived support for the State of Israel.

183.   Each Defendant Organization is vicariously liable for the actions of its leaders, organizers, and Individual Defendants who were acting as agents or under apparent authority of such Defendant Organization.

184.   Each Defendant agreed and conspired to engage in violence and intimidation by threat of violence against Wilshire Boulevard Temple and Coalition members because of their Jewish faith and shared ancestry, and/or their support for the State of Israel, and/or their perceived support for the State of Israel.

185.   Plaintiff Wilshire Boulevard Temple is entitled to compensatory damages, statutory damages, and punitive damages in an amount to be determined by the Court, and both Plaintiffs are entitled to preliminary and permanent injunctive relief to protect them from the likelihood of continuing violations of its rights under the Ralph Civil Rights Act.

**COUNT X**

**(Interference with Exercise and Enjoyment of Rights in Violation of**

**Tom Bane Civil Rights Act, California Civil Code § 52.1)**

**(On Behalf of the Coalition)**

**Against All Defendants**

186.   Plaintiffs reallege and incorporate all prior paragraphs of this Complaint as if fully set forth herein.

COMPLAINT

187.    The Tom Bane Civil Rights Act prohibits any person, whether or not acting under color of law, from interfering by threat, intimidation or coercion with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state.

188.    The Tom Bane Act also provides a private right of action for any person whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, by another through threat, intimidation or coercion. A person whose exercise or enjoyment of those rights is interfered with, or attempted to be interfered with, is entitled to relief "including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured, including appropriate equitable and declaratory relief to eliminate a pattern or practice of conduct." Cal. Civ. Code § 52.1(c).

189.    Defendants and those acting on their behalf interfered, through threat, intimidation and coercion, with the exercise or enjoyment by Coalition members' rights to practice their faith, to move about free of intimidation or restraint, to assemble and to speak, and other rights secured by the Constitution or laws of the United States and the Constitution or laws of the State of California.

190.    Each Defendant Organization is vicariously liable for the actions of its leaders, organizers, and Individual Defendants who were acting as agents or under apparent authority of such Defendant Organization.

191.    Each Defendant agreed and conspired to interfere—by threat, intimidation or coercion—with Coalition members' rights to practice their faith, to move about free of intimidation or restraint, to assemble and to speak, and other rights secured by the Constitution or laws of the United States and the Constitution or laws of the State of California.

192.    The Coalition is entitled to preliminary and permanent injunctive relief to protect them from the likelihood of continuing violations of their rights under the Tom Bane Civil Rights Act.

## COUNT XI

### (Trespass)

### (On Behalf of Wilshire Boulevard Temple)

### Against All Defendants

193.    Plaintiff Wilshire Boulevard Temple realleges and incorporates all prior paragraphs of this Complaint as if fully set forth herein.

194.    The entry by Defendants, and those acting on their behalf, on the property of the Temple, without permission and/or in excess of permission, constituted the tort of trespass under California law.

195.    The Irmas Pavilion is owned exclusively by the Temple and is located within the Temple's clearly delineated and fenced campus. The Temple maintains exclusive control over the Irmas Pavilion and the land on which it is situated. The Temple restricts entrance to its property, and specifically to the Irmas Pavilion, to those congregants and guests who have been granted permission. And because of the alarming surge in anti-Semitism in the United States, including terrorist attacks on Jewish houses of worship and community centers, the Temple has engaged private security officers who are stationed at the entrance to the Irmas Pavilion to limit entry to permitted persons.

196.    Defendants and those acting on their behalf intentionally entered onto the Temple's property and into the Irmas Pavilion without permission, and/or intentionally or recklessly engaged in acts on the Temple's property and in the Irmas Pavilion in excess of the permission granted.

197.    Each Defendant Organization is vicariously liable for the actions of its leaders, organizers, and Individual Defendants who were acting as agents or under apparent authority of such Defendant Organization.

48

COMPLAINT

198. Each Defendant agreed and conspired to enter onto the Temple's property and into the Irmas Pavilion without permission, and/or engage in acts on the Temple's property and in the Irmas Pavilion in excess of the permission granted.

199. The Temple has suffered harm as a result of the trespass and is entitled to compensatory damages and punitive damages in an amount to be determined by the Court.

## JURY TRIAL DEMANDED

200. Plaintiffs hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

201. WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

    a.    Declaratory relief declaring that Defendants' conduct violates 18 U.S.C. § 248 and other applicable laws;

    b.    Injunctive relief prohibiting Defendants from engaging in further conduct in violation of 18 U.S.C. § 248;

    c.    Compensatory, statutory, and/or other damages available under 18 U.S.C. § 248;

    d.    An award of reasonable attorneys' fees and costs as permitted by law;

    e.    Pre- and post-judgment interest as allowed by law; and

    f.    Such other and further relief as the Court deems just and proper.

COMPLAINT

DATED: July 10, 2026

Respectfully submitted,

COVINGTON & BURLING LLP

By: _____

Daniel N. Shallman (Bar No. 180782)
Paulina Rafizadeh (Bar No. 348706)
Mathew A. Sperling (Bar No. 360266)
1999 Avenue of the Stars
Los Angeles, California 90067-4643
Telephone: + 1 (424) 332-4800
dshallman@cov.com

THE LOUIS D. BRANDEIS CENTER FOR
HUMAN RIGHTS UNDER LAW

By: _____

Marci L. Miller (Bar No. 162790)
Richard Rosen (*Pro Hac Vice Forthcoming*)
Jeffrey I. Lang (*Pro Hac Vice Forthcoming*)
Mollie Galchus (*Pro Hac Vice Forthcoming*)
1776 I Street, NW
Washington, DC 20006
Telephone: + 1 (714) 299-7157
mmiller@brandeiscenter.com

COMPLAINT