Daniel N. Shallman (Bar No. 180782)
Paulina Rafizadeh (Bar No. 348706)
Mathew A. Sperling (Bar No. 360266)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067-4643
Telephone: + 1 (424) 332-4800
dshallman@cov.com; prafizadeh@cov.com
msperling@cov.com

Marci L. Miller (Bar No. 162790)
Richard Rosen (*Pro Hac Vice*)
Jeffrey I. Lang (*Pro Hac Vice*)
Mollie Galchus (*Pro Hac Vice*)
THE LOUIS D. BRANDEIS CENTER FOR HUMAN RIGHTS UNDER LAW
1776 I Street, NW
Washington, DC 20006
Telephone: + 1 (714) 299-7157
mmiller@brandeiscenter.com; rrosen@brandeiscenter.com; jlang@brandeiscenter.com; mgalchus@brandeiscenter.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WILSHIRE BOULEVARD TEMPLE, et al.,<br><br>Plaintiffs<br><br>v.<br><br>TURTLE ISLAND LIBERATION FRONT LA, et al.,<br><br>Defendants. | Case No. 2:26-cv-07560-MCS-AJR<br><br>Assigned to the Honorable Mark C. Scarsi – Courtroom 7C<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT PEOPLE'S CITY COUNCIL'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Hearing: January 25, 2027 |

## TABLE OF CONTENTS


I. INTRODUCTION .......... 7

II. STATEMENT OF FACTS .......... 7

A. The Temple's Glazer Campus Is a Synagogue Campus Where Prayer, Study, and Jewish Day Schools Share Gated Entrances. .......... 7

B. PCC Is a Group of Self-Described "Disruptors" That Has Previously Blockaded Jewish Institutions in Los Angeles. .......... 8

C. PCC Summoned a Masked Crowd to "Shut Down" the Wilshire Boulevard Temple. .......... 9

D. Defendants, Answering PCC's Call, Blockaded the Temple and Followed PCC's "Staggered Disruptions" Playbook. .......... 10

III. PROCEDURAL HISTORY .......... 12

IV. LEGAL STANDARD .......... 13

V. ARGUMENT .......... 13

A. The Core Allegations Against PCC Are Pleaded on Direct Knowledge, and Information-and-Belief Pleading Is Proper for the Rest. .......... 14

B. The FACE Act and CA FACCE Act Claims Are Well Pleaded. .......... 15

1. PCC Made True Threats of Force. .......... 15

2. The Temple Is a Place of Worship. .......... 20

3. PCC's Conduct Interfered with the Exercise of Religious Freedom. .......... 22

C. PCC Is Liable for the Conduct of Its Leader and Agents. .......... 23

D. The Conspiracy Claims Are Adequately Pleaded, as This Court Held Against PCC in *Weinberg*. .......... 25

1. Section 1985(3) Requires No State Actor When the Conspiracy Targets Thirteenth Amendment Rights. .......... 26

2. Joint Posts, Mutual Endorsement, and Synchronized Execution Plead a Meeting of the Minds. .......... 26

VI. CONCLUSION .......... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brandenburg v. Ohio*,
395 U.S. 444 (1969) ... 20

*Chang v. Chen*,
80 F.3d 1293 (9th Cir. 1996) ... 27

*Counterman v. Colorado*,
600 U.S. 66 (2023) ... 16, 19

*Detwiler v. Mid-Columbia Med. Ctr.*,
156 F.4th 886 (9th Cir. 2025) ... 23

*Epstein v. Washington Energy Co.*,
83 F.3d 1136 (9th Cir. 1996) ... 13

*Heller v. EBB Auto Co.*,
8 F.3d 1433 (9th Cir. 1993) ... 23

*Helmann v. Codepink Women for Peace*,
2025 WL 3030582 (C.D. Cal. June 13, 2025) ... *passim*

*Henderson v. United Air Funds, Inc.*,
918 F.3d 1068 (9th Cir. 2019) ... 24

*Jingrong v. Chinese Anti-Cult World All. Inc.*,
16 F.4th 47 (2d Cir. 2021) ... 21, 22

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001) ... 13

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) ... 23

*Mendocino Env't Ctr. v. Mendocino Cnty.*,
192 F.3d 1283 (9th Cir. 1999) ... 27

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) ... 20, 24, 25

*Our Lady of Guadalupe School v. Morrissey-Berru*,
591 U.S. 732 (2020) .......... 23

*Out of Network Substance Use Disorder Claims*,
2020 WL 2114934 (C.D. Cal. Feb. 21, 2020) .......... 23

*Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*,
290 F.3d 1058 (9th Cir. 2002) .......... 15, 16, 20

*Scott v. Ross*,
140 F.3d 1275 (9th Cir. 1998) .......... 26

*Soo Park v. Thompson*,
851 F.3d 910 (9th Cir. 2017) .......... 14, 15

*Thunder Studios, Inc. v. Kazal*,
13 F.4th 736 (9th Cir. 2021) .......... 16

*United States v. Hart*,
212 F.3d 1067 (8th Cir. 2000) .......... 16

*United States v. Party for Socialism and Liberation New Jersey*,
2026 WL 2938869 (D.N.J. Sep. 30, 2026) .......... 18, 19

*United States v. Stewart*,
420 F.3d 1007 (9th Cir. 2005) .......... 16

*Virginia v. Black*,
538 U.S. 343 (2003) .......... 16

*Ward v. EEOC*,
719 F.2d 311 (9th Cir. 1983) .......... 27

*Weinberg v. National Students for Justice in Palestine*,
2026 WL 184302 (C.D. Cal. Jan. 20, 2026) .......... 25, 26, 27

*Zamani v. Carnes*,
491 F.3d 990 (9th Cir. 2007) .......... 13, 20

**Statutes**

18 U.S.C. § 248 .......... 12, 15

42 U.S.C. § 1981 .......... 12

42 U.S.C. § 1985(3) .......... 12, 25, 26, 27

Cal. Civ. Code § 51.7 .......... 13

Cal. Civ. Code § 52.1 .......... 13

Cal. Penal Code § 423.2 .......... 13, 15

**Other Authorities**

Fed. R. Civ. Pro. 12(b)(6) .......... 13

# I. INTRODUCTION

This case is not about speech. It is about a carefully conceived and coordinated attack on the oldest synagogue in Los Angeles and on the right of Jewish Angelenos to practice their faith at their religious institution without being menaced and trapped. People's City Council ("PCC") is free to criticize Israel or anyone else. It is not free to orchestrate a blockade of a house of worship.

On December 3, 2025, masked demonstrators executed PCC's plan to "shut down" Wilshire Boulevard Temple. None of it was spontaneous. PCC had called for the shutdown and told its more than 91,000 social media followers when to arrive and what to do. They sealed both entrances to the Temple's campus, encircled cars with children inside, forced two Jewish day schools into lockdown, and infiltrated a gathering inside the Temple, smashing glass and screaming slurs at attendees. PCC's leader trespassed onto the Temple's grounds, pounded on the glass, and menaced those inside, while his compatriots executed PCC's well-honed playbook of "staggered disruptions."

This is not the first time. PCC organized masked mobs at the Museum of Tolerance and at Adas Torah synagogue, where demonstrators blocked access and assaulted Jewish community members. It got away with both. Now it asks for this Court's blessing to get away with it a third time. Those responsible must be held accountable and prevented from endangering the Temple and its congregants again. The Court should deny the motion, just as it denied PCC's motion to dismiss in a similar case nine months ago—a decision that PCC's motion here conspicuously fails to mention or distinguish.

# II. STATEMENT OF FACTS

## A. The Temple's Glazer Campus Is a Synagogue Campus Where Prayer, Study, and Jewish Day Schools Share Gated Entrances.

Wilshire Boulevard Temple is a Jewish congregation and synagogue located in Los Angeles, California. First Am. Compl. ¶ 14, ECF 51 (hereinafter, the "FAC"). It is the oldest synagogue in Los Angeles and a home for an engaged congregation of Jewish congregants, guests, and visitors to practice the Jewish faith. *Id.* ¶ 100.

The Temple's Glazer Campus houses the sanctuary, offices, a library, a social service center, and two Jewish day schools. *Id.* ¶ 38. The Glazer Campus is protected by a common security barrier running along Wilshire, South Hobart, and South Harvard Boulevards. *Id.* ¶ 39. The security barrier has a single gated entrance on Wilshire Boulevard and a private gated entrance to a parking garage on Hobart Boulevard. *Id.* Within the Glazer Campus is also the Irmas Pavilion, an essential and sacred religious space for the Temple that is used for events and affairs that are consistent with the Temple's religious mission and values. *Id.* ¶ 37.

The Temple scheduled an event in the Irmas Pavilion for the local Jewish and Korean-American communities called "Innovating Safety, Empowering Communities: A Symposium on AI and Public Safety." *Id.* ¶ 2. The Symposium was set for December 3, 2025, and was an exercise of Jewish religious practice. *Id.* ¶¶ 44–45. The Temple's Senior Rabbi Joel Nickerson offered a prayer during opening remarks at the Symposium, in which he "invoked the Jewish religious obligation of *tikkun olam* [repairing the world]." *Id.* ¶ 45. Due to the dramatic increase in violent attacks on Jewish houses of worship, attendance at the Symposium was by invitation only. *Id.* ¶¶ 30, 40. Each guest was required to register in advance and was advised that security officers would check identification at the door to confirm advance registration. *Id.* ¶ 40.

### B. PCC Is a Group of Self-Described "Disruptors" That Has Previously Blockaded Jewish Institutions in Los Angeles.

PCC describes itself as an anti-capitalist collective of self-styled "disruptors." FAC ¶¶ 18, 47. It pursues its political goals through violent protest, agitation, and property destruction. *Id.* ¶¶ 47–50. It instructs its members to hide their identities while protesting and wear "bloc"—meaning dark clothing, masks, helmets, and goggles—to avoid identification and prosecution. *Id.* ¶ 47.

It has a playbook for shutting down events that includes "staggered disruptions." *Id.* ¶ 80. It directs its members to "pop off in different parts of the room" at different times in

order to "extend the disruption" by ensuring they don't all "get kicked out at the same time." *Id.* ¶ 80.

PCC has a history of attacking Jewish institutions in Los Angeles. In November 2023, it organized a violent protest at the Museum of Tolerance during a screening of a documentary about the October 7 Hamas massacre. *Id.* ¶ 50. PCC urged its members to "shut s–t down" and to "mask up." *Id.* At PCC's direction, a masked mob tried to block access to the event while assaulting Jewish community members. *Id.* PCC did the same thing in June 2024. It organized a protest at Adas Torah synagogue in which demonstrators blocked the synagogue's entrance and again assaulted Jewish community members. *Id.* ¶¶ 32, 50.

### C. PCC Summoned a Masked Crowd to "Shut Down" the Wilshire Boulevard Temple.

PCC brought its unlawful tactics to Wilshire Boulevard Temple in an effort to "shut down" the Symposium scheduled for December 3, 2025. While pretending to be free-speech warriors, PCC and the other Defendants began a coordinated effort to force cancellation of the event two days before it was set to occur. *Id.* ¶ 63. They published the contact information of Temple personnel on social media, leading to a succession of calls and emails demanding the event be cancelled. *Id.* When their doxing efforts failed, Defendants escalated their efforts.

The day before the Symposium, Defendant Organizations issued calls for their members to "wear bloc" and meet at the Temple at 8:00 a.m. the next day to "shut it down"—an unmistakable call to physically shut down the event.[1] *Id.* ¶¶ 6–7, 64, 66–68.

[1] PCC would have the Court believe that "shut it down" does not actually mean what it says and is merely a "common protest phrase." Mot. at 9. But here, the Court does not have to speculate about what PCC meant. That's because we know what actually happened at the Temple on December 3, 2025. As alleged in the Amended Complaint, PCC and its confederates tried—physically and through aggressive intimidation tactics—to shut down the Symposium.

Defendant Koreatown 4 Palestine posted the Symposium flyer overlaid with an inverted red triangle, a targeting symbol used by Hamas to reflect support for violence against Jews:




*Id.* ¶ 67. PCC "liked" the post and reposted its first screen on its own Instagram account. *Id.* ¶ 68. It then reposted the call to action to its 91,000 followers on X, exclaiming "LET'S SHUT THIS DOWN!!!" *Id.*

### D. Defendants, Answering PCC's Call, Blockaded the Temple and Followed PCC's "Staggered Disruptions" Playbook.

Heeding PCC's and its coconspirators' instructions, masked individuals began blockading the Temple's security gate on Wilshire Boulevard on December 3, 2025 at 8:00 a.m. *Id.* ¶ 72. They formed a human barricade and confronted congregants, guests, and other community members, obstructing their access to and from the Temple:




*Id.* ¶¶ 39, 72.

Defendants then closed off the Glazer Campus's other point of access. At about 9:15 a.m., roughly thirty Defendants moved to the Hobart Boulevard garage entrance, blocked the driveway, and encircled cars. *Id.* ¶ 73. With some parents and children trapped inside, these individuals blocked as many as forty cars for about forty-five minutes—all while they refused police instructions to disperse. *Id.* ¶ 75. Those caught in the blockade were surrounded and threatened. Brandeis Center Coalition Member No. 1 and Coalition Member No. 2, both Jewish Angelenos, were separately encircled by masked Defendants who screamed hateful slurs and profanities at them.[2] *Id.* ¶¶ 74, 77.

The blockade impacted all the Temple's activities that day. Children were turned away from the Glazer Campus schools, which were forced into lockdown, and the

[2] Plaintiff Louis D. Brandeis Center Coalition to Combat Anti-Semitism is an independent nonprofit membership organization. FAC ¶ 15. The Coalition's members include Temple members, parents of Temple day school students, and persons (like Coalition Members Nos. 1 and 2) who were obstructed when attempting to attend the Symposium. *Id.*

Temple's social service center was forced to close. *Id.* ¶¶ 78, 92. The start of the Symposium was delayed. *Id.* ¶ 79.

Jason Reedy—a PCC leader, organizer, and spokesperson who runs the organization's "propaganda arm"—participated in the demonstration. *Id.* ¶¶ 51, 80. Once the Symposium was finally able to start, he helped execute PCC's "staggered disruptions" playbook for shutting down events. *Id.* ¶ 80. He trespassed onto the Temple's property, took up a position on a patio just outside the room in which the Symposium was held (separated from the attendees only by a glass wall), disrupted the program, and intimidated attendees. *Id.* ¶ 86. He stalked along the glass doors and surrounding glass walls, screamed and shouted at attendees, pounded on the glass, and used his cellphone to record the program and the attendees. *Id.* He refused instructions to leave. *Id.* ¶ 87.

Defendant Jane Doe No. 1 sat among attendees with Reedy's toddler in a stroller beside her. *Id.* ¶ 82. She encouraged the toddler to make noise during the presentation, disrupting the program. *Id.* Individual Defendants, who had registered for the program under false pretenses, then began jumping to their feet in seriatim, all the while shouting threats and obscenities. *Id.* ¶¶ 10, 60, 80. One Defendant (Ray Corpus) smashed a large glass vase, sending shards past Coalition Member No. 2's leg, before charging the Israeli Consul General and kicking over the sound system. *Id.* ¶ 83. Another committed a battery on a Temple security guard. *Id.* ¶ 84.

## III. PROCEDURAL HISTORY

The Temple and the Coalition brought this action against PCC, Reedy, and other organizations and individuals to hold them responsible for the coordinated attack. The Temple and Coalition allege eleven counts:

- <u>Counts I–III:</u> Freedom of Access to Clinic Entrances Act (the "FACE Act"), 18 U.S.C. § 248(a)
- <u>Count IV:</u> Conspiracy to Deprive Civil Rights, 42 U.S.C. § 1985(3)
- <u>Count V:</u> Denial of Benefits of Law on Account of Race, 42 U.S.C. § 1981

- Counts VI–VIII: California Freedom of Access to Clinic and Church Entrances Act (the "CA FACCE Act"), Cal. Penal Code § 423.2
- Count IX: Ralph Civil Rights Act, Cal. Civil Code § 51.7
- Count X: Bane Civil Rights Act, Cal. Civil Code § 52.1
- Count XI: Trespass

FAC ¶¶ 93–215.

PCC moved to dismiss the Amended Complaint, arguing that the Temple and Coalition have failed to state plausible claims. Mot. to Dismiss, ECF 65. The Temple and Coalition file this opposition in response.

## IV. LEGAL STANDARD

In determining a motion to dismiss alleging failure to state a claim, all factual allegations set forth in the complaint "are taken as true and construed in the light most favorable to Plaintiffs." *Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996). "Factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Review is therefore limited to the Amended Complaint.[3]

## V. ARGUMENT

Each of PCC's arguments fails. The Temple and Coalition's claims rest on direct knowledge, not merely information and belief, and the Amended Complaint plainly alleges that PCC is both directly and vicariously liable under an array of state and federal laws. And beyond a generalized challenge to vicarious liability, PCC fails to even address several of the Amended Complaint's claims, *e.g.*, trespass, forfeiting any independent challenge to them. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

---

[3] The Temple and Coalition have filed a separate brief, partially opposing PCC's request for judicial notice of two exhibits.

### A. The Core Allegations Against PCC Are Pleaded on Direct Knowledge, and Information-and-Belief Pleading Is Proper for the Rest.

PCC misreads the allegations against it as resting primarily on information and belief, Mot. at 3–4, when in reality the Amended Complaint's core allegations against PCC are pleaded on direct knowledge. The Amended Complaint details, for example, how PCC "liked" Koreatown 4 Palestine's post targeting the Symposium, before adopting it as its own and urging its followers on Instagram and X to "SHUT THIS DOWN!!!" FAC ¶ 68. The Amended Complaint then alleges, again without any information-and-belief qualifier, that PCC and its coconspirators assembled as directed and carried out PCC's disruptions "playbook." *Id.* ¶¶ 72, 80. The Temple and Coalition's claims against PCC stand soundly upon allegations pleaded with direct knowledge.

The handful of allegations against PCC that are made upon information and belief are proper. The Ninth Circuit has explained that it is appropriate for plaintiffs to plead "facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017). All the Amended Complaint's information-and-belief allegations against PCC fall well within that scope, alleging that PCC:

- "is an unincorporated association without a formal place of business," FAC ¶ 18;
- has "members who obscured their identities while engaged in unlawful and tortious actions at the December 3, 2025 demonstration," *id.* ¶ 18;
- directed demonstrators and coordinated with others "on their plan to disrupt the Symposium," *id.* ¶¶ 70, 73; and
- has not "disavowed what occurred at the Temple on December 3, 2025," *id.* ¶ 69.

All these allegations are peculiarly within PCC's control and based on factual information that makes them plausible. For example, the identity of PCC members among the masked

demonstrators is within PCC's control and plausible because it encourages its members "to conceal their identities and avoid creating records of their activities by remaining anonymous, covering their faces, limiting electronic communications, and avoiding photographs and other documentation." *Id.* ¶ 47. It does this specifically to defeat liability, declaring "[n]o face, no case!" *Id.* Pleading upon information and belief is more than appropriate when faced with this brazen effort to stymie the legal system.

**B. The FACE Act and CA FACCE Act Claims Are Well Pleaded.**

The Amended Complaint asserts six claims against PCC under the FACE Act and CA FACCE Act. FAC ¶¶ 93–134, 165–188. The FACE Act prohibits (i) threats of force, force, or physical obstruction, (ii) that is intended or does (iii) intimidate or interfere with a person lawfully seeking to exercise the right of religious freedom, (iv) at a place of religious worship. 18 U.S.C. § 248(a)(2). The Act also prohibits (i) intentional damage or destruction of property (ii) that is owned by a place of worship. *Id.* § 248(a)(3). The CA FACCE Act enshrines similar prohibitions under California state law. Cal. Penal Code § 423.2.[4]

The Amended Complaint alleges all the elements under these laws. It alleges that PCC—based on its own acts and those of its agents and coconspirators—made threats of force and engaged in physical obstruction and property damage at a place of worship that interfered with the exercise of religious freedom.

1. <u>PCC Made True Threats of Force.</u>

Under the FACE Act and CA FACCE Act, a threat of force, or a true threat, is a statement reasonably understood to communicate a serious expression of intent to inflict bodily harm. *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1077 (9th Cir. 2002). A court must consider "the entire factual

[4] Both the FACE Act and CA FACCE Act prohibit similar actions in connection with persons seeking or providing reproductive healthcare. 18 U.S.C. § 248; Cal. Penal Code § 423.2.

context" and "all of the circumstances" to determine whether a statement is a true threat. *Id.* (citation omitted). A threat need not be explicit—the "fact that a threat is subtle does not make it less of a threat." *Id.* at 1075. A symbol alone, based on context, may constitute a true threat. *Virginia v. Black*, 538 U.S. 343, 360 (2003) (burning cross "often" true threat given history as white-supremacist symbol); *United States v. Hart*, 212 F.3d 1067, 1072 (8th Cir. 2000) (parking trucks near reproductive health clinic, recalling Oklahoma City bombing, constituted true threat).

A defendant may be liable for a true threat even if it acted without purpose or knowledge that its statement would be received as a threat. Indeed, liability attaches whenever a defendant consciously disregards a substantial risk that its statement would be viewed as threatening violence. *Counterman v. Colorado*, 600 U.S. 66, 69 (2023). As the Supreme Court has explained, all that is needed is "insufficient concern with risk, rather than awareness of impending harm." *Id.* at 79.

Nor does a true threat need to be communicated to—or even seen by—the victim. *United States v. Stewart*, 420 F.3d 1007, 1016, 1018–19 (9th Cir. 2005) (statement from one prisoner to another threatening harm to a judge sufficed); *Helmann v. Codepink Women for Peace*, 2025 WL 3030582, at *12 (C.D. Cal. June 13, 2025) (social media post to followers plausibly constituted true threat to synagogue). Likewise, a defendant "need not actually intend to carry out the threat." *Virginia*, 538 U.S. at 359–60.

When considering "the whole factual context and all of the circumstances," a court should also consider a defendant's history of violent and disruptive protests. *Planned Parenthood,* 290 F.3d at 1078 (courts should consider defendants' "propensity to engage in violence"). A "statement that does not explicitly threaten violence may be a true threat where a speaker makes a statement against a known background of targeted violence." *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 746 (9th Cir. 2021) (citation omitted). Thus, in *Helmann*, which denied a motion to dismiss a FACE Act claim based solely on a social media post, Judge Wilson took into account "CodePink's history of violent and disruptive

protests [which] makes it more likely that a reasonable person would interpret their use of the inverted red triangle as a threat." 2025 WL 3030582, at *13.

PCC's argument that the Amended Complaint fails to plausibly allege a threat of force is based on two assertions—that the Temple and Coalition's claims are based exclusively on PCC's social media posts, and that those posts are constitutionally protected political speech. Mot. at 5–10. Both assertions are wrong.

For starters, while the Amended Complaint's allegations against PCC are *not* limited to its social media posts, those December 2, 2025 posts alone are sufficient to plead a claim for threat of force under the FACE Act and CA FACCE Act. PCC—an organization with a record of advocating and engaging in violent confrontation against Jewish institutions—publicly endorsed a post featuring a large red X scrawled over the Symposium program and the notorious inverted red triangle used by Hamas and its supporters to target Jews for violence. FAC ¶¶ 7, 67–68. PCC's posts also called its followers to the Temple and stated what it intended to do: "Shut It Down." *Id.* That is not merely a "common protest phrase," Mot. at 9, but a reference to PCC's signature playbook for blockading events from the outside and infiltrating them from the inside via "staggered disruptions." FAC ¶¶ 49, 70, 80.

In addition to PCC's December 2, 2025 social media posts, the Amended Complaint alleges that PCC, acting through its agents, made threats of force at the Temple on December 3, 2025 while obstructing access to the Temple and trespassing on its property. The Amended Complaint alleges that Reedy—a PCC leader, organizer, spokesperson, and architect of the group's strategies for disruption—trespassed onto the Temple's property that was protected by a security barrier and guards. FAC ¶¶ 39, 86–87. He stationed himself on the patio adjacent to the Symposium room, with only glass separating him from the Symposium attendees. *Id.* He then pounded on that glass and screamed at the frightened attendees. *Id.* He refused to leave and prevented the frightened attendees from evacuating the room. *Id.*

The Amended Complaint also alleges that PCC is liable for the acts of its coconspirators in furtherance of a conspiracy to use threats of force. The Amended Complaint alleges, for example, that Defendant Ray Corpus smashed a glass vase sending shards flying causing a Coalition member to fear an explosion, then screamed obscenities and slurs while charging a Symposium guest. FAC ¶ 83. It also alleges that masked Defendants surrounded the cars of Symposium attendees and parents trying to drop off children at school, screaming slurs and obscenities at them. *Id.* ¶ 75. One Defendant accosted a parent trying to enter the Temple's security gate and threatened to "fuck [him] up." *Id.* ¶¶ 75–77.

Here, the Amended Complaint alleges sufficient facts to plausibly plead a threat of force. In *Helmann*, for example, Judge Wilson denied a motion to dismiss a FACE Act claim which, unlike the claim asserted in the Amended Complaint, was based *only* on a social media post. In that case, a single social media post announced a protest of a real estate seminar at a synagogue. The post called on followers to "help us advocate the stop of homes being sold on Palestinian land," which on its face did not contain a true threat. *Helmann*, 2025 WL 3030582, at *12. But the post included the event date and synagogue address inside an inverted red triangle. Judge Wilson held that the "use of the inverted red triangle, as alleged, plausibly constitute[d] a true threat," and the defendant's "history of violent and disruptive protests makes it more likely that a reasonable person would interpret their use of the inverted red triangle as a threat." *Id.* at *12–13.

PCC ignores *Helmann*. Instead, it cites *United States v. Party for Socialism and Liberation New Jersey*, 2026 WL 2938869 (D.N.J. Sep. 30, 2026), which dismissed a FACE Act claim based on a social media post announcing a protest of a real estate event. But in that case, the post did not identify the synagogue. It listed only a public intersection and called on followers to "protest land theft in our backyard." On its face, the post did not contain a true threat or violent imagery, and there were no allegations that the defendant had a history of violence. While PCC asserts that *Party for Socialism and Liberation* is a "similar FACE Act case," Mot. at 9, PCC ignores that court's analysis of *Helmann*, which

it explained "is useful in contrast" because there "the complaint alleged a synagogue-address post containing a symbol allegedly associated with extermination of Jews, against a pleaded history of the organizer's violent protests. Those context-specific allegations supported a threat inference." 2026 WL 2938869, at *13.

Throughout its brief, PCC argues that its posts are protected political speech that, at worst, merely advocate violence generally and therefore are protected under the First Amendment. But the specific allegations in the Amended Complaint are narrowly focused on PCC's own particular threats of force—its expressions of intent to inflict harm. The Amended Complaint's allegations do not take issue with PCC's political ideology or seek to impose liability based on PCC's advocacy for others to engage in violence.

PCC urges this Court to apply the wrong legal standard and, on that basis, decide that PCC's statements, as a matter of law, are protected political speech. Its arguments are based on mischaracterizations and misleading quotations of case law. PCC argues, for example, that the Temple and Coalition must meet the "high bar of showing intent for a true threat." Mot. at 8–9 (quoting *Counterman*, 600 U.S. at 81). In *Counterman,* however, the Supreme Court held that to convict a defendant of making a true threat, the government only must prove that the defendant "***consciously disregarded*** a substantial risk that his communications would be viewed as threatening violence." 600 U.S. at 69 (emphasis added). The Court was clear that the "State need not prove any more demanding form of subjective intent." *Id.* PCC tries to avoid that standard by quoting from later discussion in the opinion in which the Court ***distinguished*** the higher standard required to prove incitement. PCC omits the opinion's preceding sentence that states: "It is true that our incitement decisions demand more"—*i.e.*, more than a true threat—"but the reason for that demand is not present here." *Counterman*, 600 U.S. at 81. In any event, *Counterman* reviewed a criminal conviction after a jury trial on a full evidentiary record and did not address the sufficiency of a civil complaint. Whether PCC acted with the requisite mental state is a factual question ill-suited for resolution under the liberal pleading standards that govern this motion.

PCC also argues that the Amended Complaint fails to allege a threat of force based on "clearly established Ninth Circuit precedent"—but once again, its argument relies on misleading quotations. Mot. at 10–11. PCC's quotation from *Planned Parenthood*, 290 F.3d 1058, does not address a threat of force—it discusses the protection afforded to speech advocating violence generally (which is qualitatively different from a true threat and not the basis of the claims here). The opinion's very next sentence—omitted by PCC—is explicit: "However, while advocating violence is protected, threatening a person with violence is not." *Id.* at 1072. PCC similarly argues that its threat of force is protected under *Brandenburg v. Ohio*, 395 U.S. 444 (1969), and *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982), but those cases addressed only advocacy of violence to achieve political reform—not threats. *Planned Parenthood*, 290 F.3d at 1073 ("*Claiborne*, of course, did not arise under a threats statute.").

Finally, although PCC incorrectly insists that the Amended Complaint does not sufficiently allege vicarious liability based on Reedy's actions and the acts of its coconspirators, nowhere does it dispute that their actions constitute a threat of force. As a result, PCC forfeits that argument.[5] *See Zamani*, 491 F.3d at 997.

2. <u>The Temple Is a Place of Worship.</u>

PCC argues that the Irmas Pavilion does not constitute a "place of worship" within the meaning of the FACE Act. Mot. at 11–12. The FACE Act and CA FACCE Act claims asserted against PCC, however, allege that the Temple's unified campus constitutes a place of worship, which PCC has not challenged and has therefore forfeited. *See, e.g.*, FAC ¶ 100 ("Plaintiff Wilshire Boulevard Temple is a place of religious worship").

A place of religious worship is "a space devoted primarily to religious worship activity—that is, anywhere that religious adherents collectively recognize or religious

---

[5] PCC's only argument specifically directed toward the Temple and Coalition's Ralph Act and Bane Act claims entirely tracks its true threat argument on the FACE and CA FACCE Act claims. Mot. at 13–14. The argument fails for the same reason. The Amended Complaint does state a true threat of force.

leadership designates as a place primarily to gather for or to hold religious worship activities." *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 57 (2d Cir. 2021). The Amended Complaint alleges that the Temple for generations has been recognized by its congregation as a center of spirituality for the practice of Jewish faith. FAC ¶ 100. It comprises a single unified campus that includes its Sanctuary, library, its two Jewish day schools, and the Irmas Pavilion, and "is protected by a common security barrier running along Wilshire, South Hobart, and South Harvard Boulevards" with "a single gated entrance" on Wilshire Boulevard. *Id.* ¶¶ 38–39. The Temple's campus hosts, on a daily basis, individual and congregational prayer services, pastoral services, religious lifecycle events, Jewish day schools, religious classes, and individual and group religious studies in its libraries and study halls, as well as a social services center where congregants fulfill the foundational Jewish obligation of *tikkun olam*. *Id.* ¶¶ 100–01.

On the day of the Symposium, "the Temple's [two] Jewish day schools were in session. The Irmas Pavilion's library and study halls were open for individual and partnered Jewish learning and reflection. In addition, the Sanctuary adjacent to the Irmas Pavilion was open for prayer and reflection." *Id.* ¶ 103. Reedy and his coconspirators blockaded both entrances to the Temple's campus and threatened force against and intimidated people attempting to enter. *Id.* ¶¶ 72–78. Their actions were not solely targeted toward people seeking to attend the Symposium. On the contrary, masked individual coconspirators blocked the Temple's parking garage, surrounding the cars of parents trying to drop off their children at school and forcing others who saw what was happening to return home. *Id.* ¶ 78.

Beyond the Temple's undisputed status as a place of worship, the Amended Complaint also pleads that the Irmas Pavilion itself constitutes a place of worship. The Amended Complaint alleges that the Irmas Pavilion, situated on the Temple's campus immediately next to the Sanctuary, is "an essential religious space" that is recognized by the Temple and the congregation as "sacred." FAC ¶ 37. The Pavilion is a site of

communal prayer, Shabbat services, High Holy Day services (the holiest days of the Jewish year), bar and bat mitzvahs, and Jewish weddings. *Id.*

PCC disputes that the Pavilion is used primarily for religious worship by improperly relying on its own allegations of fact—none of which are contained in the Amended Complaint. The Temple and Coalition oppose PCC's attempt to rely on select screenshots from the Pavilion's website, which are neither cited in nor referred to in the Amended Complaint. *See* Pls.' Opp'n in Part to Def.'s Request for Judicial Notice (Oct. 30, 2026).

But even were the screenshots considered, nothing in them is inconsistent with the Amended Complaint's allegation that the Pavilion is used for religious worship activities. The law is clear that, as long as a house of worship's *primary purpose* remains religious worship, the place of worship will remain protected even if it serves other purposes. *Jingrong*, 16 F.4th at 58. The Amended Complaint alleges the Pavilion's primary purpose is for religious worship activities and that the Temple also "rents space at the Irmas Pavilion for events and affairs that are consistent with the Temple's religious mission and values," like Jewish wedding celebrations and bar and bat mitzvahs. FAC ¶ 37. Doing so does not strip the Pavilion of its primary religious purpose.

3. <u>PCC's Conduct Interfered with the Exercise of Religious Freedom.</u>

PCC argues that the Symposium was not dedicated to religion or religious practice and therefore did not constitute an exercise of freedom of religion. Mot. at 11–12. PCC simply ignores the Amended Complaint's allegations of fact relating to the religious mission of the Symposium, which must be taken as true on a motion to dismiss. *See Helmann*, 2025 WL 3030582, at *1 n.2 ("At the motion to dismiss stage, the Court takes Plaintiffs' allegations regarding the religious nature of the Aliyah Event as true").

The Amended Complaint, for example, alleges that the Temple agreed to host the Symposium because it furthered a core component of the Temple's religious mission: *tikkun olam*. FAC ¶ 41. At the outset of the program, Rabbi Nickerson offered a prayer, invoked the Jewish religious obligation of *tikkun olam*, and emphasized that the Symposium was an exercise of Jewish religious practice. *Id.* ¶ 45.

PCC improperly asks the Court to ignore those well-pleaded allegations, and, with no support whatsoever, adopt its view of the nature of the Symposium. But "[c]ourts may not substitute their own judgment for that of the believer's." *Detwiler v. Mid-Columbia Med. Ctr.*, 156 F.4th 886, 894 (9th Cir. 2025) ("belief grounded in overlapping secular and religious considerations is presumably protected"); *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993) ("it is no business of courts to say . . . what is a religious practice or activity").

Moreover, PCC's actions, and those of its coconspirators, were not limited to people seeking to attend or attending the Symposium. They intentionally obstructed, accosted, and threatened people trying to enter, or already inside, the Temple—whether or not they were attending the Symposium. Thus, the Amended Complaint alleges that PCC and its coconspirators interfered with people seeking to exercise religious freedom in ways separate and apart from the Symposium, including parents and their children who were blocked from entering the parking garage for drop-off at the Temple's Jewish day schools. FAC ¶ 75. The Constitution protects "the practice of educating one's children in one's religious beliefs," including "a parent's decision to send his or her child to a private religious school." *Mahmoud v. Taylor,* 606 U.S. 522, 547 (2025) ("[F]or many people of faith across the country, there are few religious acts more important than the religious education of their children."); *see Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732, 754 (2020) ("Religious education is vital to many faiths practiced in the United States.").

**C. PCC Is Liable for the Conduct of Its Leader and Agents.**

"[T]he precise details of the agency relationship need not be pleaded to survive a motion to dismiss." *Out of Network Substance Use Disorder Claims*, 2020 WL 2114934, at *12 (C.D. Cal. Feb. 21, 2020). All that must be pleaded is "sufficient facts" that "support a reasonable inference that an agency relationship existed" via actual authority, apparent authority, or ratification. *Id.*; *see Helmann*, 2025 WL 3030582 at *18. An agency relationship exists when a principal "manifests assent" that an agent "shall act on the

principal's behalf and subject to the principal's control," and the agent consents. *Henderson v. United Air Funds, Inc.*, 918 F.3d 1068, 1073 (9th Cir. 2019)).

Reedy is undoubtably an agent of PCC. PCC has consented to Reedy speaking on its behalf, including through the podcasts that it produces, and Reedy has agreed to host the podcast. This is a classic manifestation of assent to "act on the principal's behalf." *Henderson*, 918 F.3d at 1073. Moreover, facts showing a leadership role in an organization often show an agency relationship. In *Claiborne Hardware*, for example, the Supreme Court explained there was "no question" that an NAACP field secretary was the organization's agent. 458 U.S. at 930 n.76. Reedy's role as a leader and organizer for PCC is at least as central.

The Amended Complaint goes above and beyond what is required to state an agency relationship between Reedy and PCC. As to Reedy's background with the group, it alleges that Reedy:

- is a "leader and organizer of PCC";
- is an "architect" of its tactics;
- "identifies himself on social media and in interviews as an organizer of PCC";
- runs PCC's "propaganda arm," which identifies Reedy as a PCC organizer; and
- "serves as a principal spokesperson for PCC, including as a host of PCC's podcast" which PCC maintains on its website.

FAC ¶¶ 24, 51.[6]

[6] Plaintiffs note PCC's disingenuous efforts to insulate itself from Reedy's conduct. Indeed, underscoring their close relationship, PCC and Reedy originally engaged the very same lawyers to represent them both ***in this case***. *See, e.g.*, Notice of Appearance, ECF 33. Apparently recognizing the need to dig an artificial moat between themselves, Reedy and PCC now have separate counsel.

The Amended Complaint alleges that, leading up to and during the December 3, 2025 PCC-organized attack, Reedy acted "within his scope and authority as a representative and agent" of the group. *Id.* ¶ 24. Specifically, he was executing PCC's "well-honed strategy for staging demonstrations." *Id.* ¶¶ 49, 80. He followed PCC's "playbook" in disrupting the Symposium and, in doing so, violated state and federal law. *Id.* ¶ 80. In *Claiborne Hardware*, after the presentation of evidence at a full trial, the Supreme Court determined that certain of NAACP's agents acted outside of their actual authority because their behavior was "directly contrary to NAACP policy." 458 U.S. at 930. Reedy, by contrast, followed PCC policy at the demonstration to a tee. PCC has consistently endorsed trespass and violence as demonstration tactics, including on the very podcast Reedy hosts. FAC ¶¶ 47–48.

PCC also ratified Reedy's conduct. It never disavowed his activities on December 3, 2025, nor the activities of others that day. *Id.* ¶ 69. It has not retracted its directives to demonstrators, disclaimed violent protest tactics more generally, or otherwise distanced itself from Reedy and his illegal activities. *Id.*

### D. The Conspiracy Claims Are Adequately Pleaded, as This Court Held Against PCC in *Weinberg*.

PCC throws up a grab-bag of arguments to try to escape the Temple and Coalition's conspiracy claims, Mot. at 16–20, all of which miss the mark in light of this Court's decision in *Weinberg v. National Students for Justice in Palestine,* 2026 WL 184302 (C.D. Cal. Jan. 20, 2026). There, PCC was sued after it "allegedly engaged in a 'coordinated social media campaign,'" encouraging its "followers to join the encampment" at UCLA that was established to criticize Israel and show solidarity with Gaza. *Id.* at *7. PCC argued that the claims against it should be dismissed because, in its view, the complaint at most alleged "that PCC expressed support for a protest, promoted it, and recruited for it." *Id.* at *11. This Court was "not persuaded," explaining that the complaint did "not seek to hold PCC liable for protected speech" but instead permissibly relied on PCC's social media postings as "evidence" supporting their claims, including their Section 1985(3) claim. *Id.*

1. Section 1985(3) Requires No State Actor When the Conspiracy Targets Thirteenth Amendment Rights.

Claims brought under Section 1985(3) generally "do not require state action." *Scott v. Ross*, 140 F.3d 1275, 1284 (9th Cir. 1998). As this Court explained in the *Weinberg* case, Section 1985(3) claims that allege private conspiracies infringing others' Thirteenth Amendment right to freedom of travel and freedom from racial violence are subject to that general rule. 2026 WL 184302, at *7.

The Temple and Coalition allege that PCC conspired to deprive them of their Thirteenth Amendment right to "freedom of movement and the right to be free from racial and religious violence." FAC ¶ 146. PCC nowhere disputes that private conspiracies to violate these Thirteenth Amendment rights are actionable under Section 1985(3). Instead, it focuses the entirety of its argument on the strawman proposition that the Fourteenth Amendment right to equal protection requires state action to be actionable under Section 1985(3). Mot. at 16–17. But as in *Weinberg*, the Temple and the Coalition's claim rests on Thirteenth Amendment rights, not Fourteenth Amendment rights.

2. Joint Posts, Mutual Endorsement, and Synchronized Execution Plead a Meeting of the Minds.

The Amended Complaint pleads a meeting of the minds between PCC and its coconspirators. PCC and Koreatown 4 Palestine "issued the same December 2, 2025 social media posts" calling on followers to shut down the Symposium, and each "liked" the other's post. FAC ¶¶ 68, 139. PCC adopted Koreatown 4 Palestine's post—marked with a Hamas red triangle—as its own and directed its 91,000 X followers to mass at the Temple at 8:00 a.m. the next day. *Id.* ¶¶ 67–68, 141. Defendants also published the contact information of Temple personnel, who then received a barrage of communications using "materially identical" language. *Id.* ¶¶ 5, 63. Masked demonstrators arrived at the very time and place the Defendant Organizations specified, wearing bloc as directed. *Id.* ¶¶ 69, 72. PCC leader Reedy organized and participated in the demonstration, *id.* ¶ 24, where he and other coconspirators executed PCC's signature "staggered disruptions" playbook

inside the Symposium, *id.* ¶¶ 49, 80–82, 86–87. PCC was no bystander. It coordinated its calls to action with its coconspirators, recruited the demonstrators who blockaded the Temple, and put its own leader on the Temple grounds, where he menaced attendees from the Symposium patio. *Id.* ¶¶ 24, 68, 72, 86–87, 139.

This Court found materially similar allegations sufficient to plead a conspiracy against PCC in *Weinberg*, 2026 WL 184302. There, the Court explained that a "conspiracy may be inferred from conduct and need not be proven by evidence of an express agreement." *Id.* at *6 (quoting *Ward v. EEOC*, 719 F.2d 311, 314 (9th Cir. 1983)). Applying that rule, the Court held that PCC's "joint public statements and social media posts" with a co-defendant urging followers to join a protest, together with PCC organizers on the ground, "support[ed] an inference that they had entered into an agreement." *Id.* at *7. The Court further emphasized that direct evidence of an agreement "will only rarely be available," particularly at the pleading stage. *Id.* (quoting *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1302 (9th Cir. 1999)).

The same result follows here, where PCC jointly promoted the attack, directed the conduct of demonstrators, and placed its leader on the ground to carry out the plan. The Amended Complaint more than plausibly alleges a meeting of the minds.[7]

## VI. CONCLUSION

For the foregoing reasons, the Temple and Coalition respectfully request that the Court deny PCC's motion to dismiss in its entirety. Should the Court grant the motion in any respect, however, the Temple and Coalition respectfully request that dismissal be without prejudice and with leave to amend. *See Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996).

---

[7] PCC tacks onto the end of its brief the bare-bones—and mistaken—argument that the conspiracy allegations are untethered to any "underlying" legal violations. Mot. at 20. That is not the case. The Temple and Coalition have alleged that PCC conspired to violate a litany of federal and state laws, including Section 1985(3), the CA FACCE Act, the Ralph Act, the Bane Act, and laws of trespass. *See, e.g.*, FAC ¶¶ 174, 181, 187, 199, 206, 214.

DATED: October 30, 2026

Respectfully submitted,

COVINGTON & BURLING LLP

By: /s/ *Daniel S. Shallman*
Daniel N. Shallman (Bar No. 180782)
Paulina Rafizadeh (Bar No. 348706)
Mathew A. Sperling (Bar No. 360266)
1999 Avenue of the Stars
Los Angeles, California 90067-4643
Telephone: + 1 (424) 332-4800
dshallman@cov.com

THE LOUIS D. BRANDEIS CENTER FOR HUMAN RIGHTS UNDER LAW

By: /s/ *Marci L. Miller*
Marci L. Miller (Bar No. 162790)
Richard Rosen (*Pro Hac Vice*)
Jeffrey I. Lang (*Pro Hac Vice*)
Mollie Galchus (*Pro Hac Vice*)
1776 I Street, NW
Washington, DC 20006
Telephone: + 1 (714) 299-7157
mmiller@brandeiscenter.com

*Attorneys for Plaintiffs Wilshire Boulevard Temple and The Louis D. Brandeis Center Coalition to Combat Anti-Semitism, Inc.*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs Wilshire Boulevard Temple and The Louis D. Brandeis Center Coalition to Combat Anti-Semitism, Inc., certifies that this brief contains 6,932 words, which complies with the word limit of L.R. 11-6.1.

DATE: October 30, 2026

*/s/ Daniel N. Shallman*
Daniel N. Shallman (Bar No. 180782)