Daniel N. Shallman (Bar No. 180782)
Paulina Rafizadeh (Bar No. 348706)
Mathew A. Sperling (Bar No. 360266)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067-4643
Telephone: + 1 (424) 332-4800
dshallman@cov.com; prafizadeh@cov.com
msperling@cov.com

Marci L. Miller (Bar No. 162790)
Richard Rosen (*Pro Hac Vice*)
Jeffrey I. Lang (*Pro Hac Vice*)
Mollie Galchus (*Pro Hac Vice*)
THE LOUIS D. BRANDEIS CENTER FOR HUMAN RIGHTS UNDER LAW
1776 I Street, NW
Washington, DC 20006
Telephone: + 1 (714) 299-7157
mmiller@brandeiscenter.com; rrosen@brandeiscenter.com;
jlang@brandeiscenter.com; mgalchus@brandeiscenter.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

WILSHIRE BOULEVARD TEMPLE, et al.,

Plaintiffs

v.

TURTLE ISLAND LIBERATION FRONT LA, et al.,

Defendants.

Case No. 2:26-cv-07560-MCS-AJR

Assigned to the Honorable Mark C. Scarsi – Courtroom 7C

**PLAINTIFFS' OPPOSITION TO DEFENDANT JASON REEDY'S MOTION TO DISMISS FIRST AMENDED COMPLAINT UNDER FED. R. CIV. P. 12(B)(1) AND 12(B)(6)**

Hearing: January 25, 2027

# TABLE OF CONTENTS


I. INTRODUCTION ........ 8

II. STATEMENT OF FACTS ........ 8

A. The Glazer Campus Is a Synagogue Campus Where Prayer, Study, and Jewish Day Schools Share Gated Entrances. ........ 8

B. Reedy and Defendants Summoned a Masked Crowd to "Shut Down" the Temple. ........ 9

C. Reedy Entered Without Permission, Pounded on the Glass, Blocked the Patio Exit, and Refused to Leave. ........ 13

III. PROCEDURAL HISTORY ........ 14

IV. LEGAL STANDARD ........ 14

V. ARGUMENT ........ 15

A. Plaintiffs Have Standing to Seek Injunctive Relief. ........ 15

B. The Amended Complaint States a FACE Act Claim. ........ 17

1. The Amended Complaint Alleges Prohibited Conduct at a "Place of Religious Worship." ........ 18

2. The Amended Complaint Pleads Exercise of Religious Freedom. ........ 20

3. Reedy Used Threats of Force and Physical Obstruction. ........ 20

4. The FACE Act Does Not Require Intent to Interfere with Religious Freedom. ........ 23

5. The FACE Act is Constitutional. ........ 23

6. The FACE Act Permits Conspiracy Liability, and the Amended Complaint Alleges Reedy Joined the Conspiracy. ........ 24

C. Section 1985(3) Reaches Private Actors Infringing Thirteenth Amendment Rights, and Plaintiffs Allege Discriminatory Animus. ........ 26

D. Section 1981 Claims Reach Private Conduct. ........ 27

E. The State-Law Claims Are Properly Pleaded. ..... 28
1. The Temple May Sue Under the Ralph Act. ..... 28
2. The Amended Complaint Alleges CA FACCE Act Claims. ..... 28
3. The Ralph and Bane Act Claims Rest on Conduct, Not Speech. ..... 29
4. Reedy Trespassed on Temple Property. ..... 29
VI. CONCLUSION ..... 30

# TABLE OF AUTHORITIES


**Page(s)**

**Cases**

*Cassinos v. Union Oil Co.*,
18 Cal. Rptr. 2d 574 (1993) ........ 30

*Chang v. Chen*,
80 F.3d 1293 (9th Cir. 1996) ........ 30

*Chapman v. Higbee Co.*,
319 F.3d 825 (6th Cir. 2003) (en banc) ........ 27

*Civic W. Corp. v. Zila Indus., Inc.*,
135 Cal. Rptr. 915 (Ct. App. 1977) ........ 29

*Counterman v. Colorado*,
600 U.S. 66 (2023) ........ 21

*Davidson v. Kimberly-Clark Corp.*,
889 F.3d 956 (9th Cir. 2018) ........ 15

*Dickinson v. Trump*,
827 F. Supp. 3d 1375 (D. Or. 2026) ........ 16

*Elend v. Basham*,
471 F.3d 1199 (11th Cir. 2006) ........ 17

*Epstein v. Washington Energy Co.*,
83 F.3d 1136 (9th Cir. 1996) ........ 14

*Femhealth USA, Inc. v. Nelson*,
2025 WL 479394 (M.D. Tenn. Jan. 13, 2025) ........ 22

*FemHealth v. Williams*,
2022 WL 4241269 (M.D. Tenn. Sep. 14, 2022) ........ 25

*Frankel v. Regents of Univ. of Cal.*,
744 F. Supp. 3d 1015 (C.D. Cal. 2024) ........ 15

*Gonzales v. Raich*,
545 U.S. 1 (2005) ........ 24

*Helmann v. CodePink Women for Peace*,
2025 WL 3030582 (C.D. Cal. June 13, 2025) ........................................................ 21

*Index Newspapers LLC v. United States Marshals Serv.*,
977 F.3d 817 (9th Cir. 2020) ................................................................................ 15

*J. R. Norton Co. v. Gen. Teamsters, Warehousemen & Helpers Union*,
256 Cal. Rptr. 246 (Ct. App. 1989) ..................................................................... 28

*Jingrong v. Chinese Anti-Cult World All.*,
16 F.4th 47 (2d Cir. 2021) ................................................................ 18, 19, 23, 24

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ................................................................................ 15

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001) ................................................................................ 15

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .............................................................................................. 17

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) .............................................................................................. 20

*Marcavage v. City of New York*,
689 F.3d 98 (2d Cir. 2012) .................................................................................. 17

*Mbacke v. Federated Department Stores, Inc.*,
2008 WL 11449290 (D. Nev. Dec. 15, 2008) ....................................................... 27

*Midpeninsula Citizens for Fair Hous. v. Westwood Invs.*,
271 Cal. Rptr. 99 (Ct. App. 1990) ....................................................................... 28

*My Future Consulting, Inc. v. Volt Mgmt. Corp.*,
2022 WL 2189504 (C.D. Cal. Mar. 17, 2022) ...................................................... 27

*New Beginnings Ministries v. George*,
2018 WL 11378829 (S.D. Ohio Sept. 28, 2018) ................................................... 24

*Phillip v. Univ. of Rochester*,
316 F.3d 291 (2d Cir. 2003) ................................................................................ 27

*Planned Parenthood of Columbia/Willamette v. Am. Coal. of Life Activists*,
290 F.3d 1058 (9th Cir. 2002) ................................................................... 20, 21, 25

*New York ex rel. Spitzer v. Cain*,
418 F. Supp. 2d 457 (S. D. N. Y. 2006) .......... 22

*Stamps v. Superior Ct.*,
39 Cal. Rptr. 3d 706 (2006) .......... 28

*Stand With US Ctr. for Legal Just. v. MIT*,
158 F.4th 1 (1st Cir. 2025) .......... 27

*United States v. Dugan*,
450 F. App'x 20 (2d Cir. 2011) .......... 22

*United States v. Hart*,
212 F.3d 1067 (8th Cir. 2000) .......... 21

*United States v. Mahoney*,
247 F.3d 279 (D.C. Cir. 2001) .......... 22

*United States v. Morrison*,
529 U.S. 598 (2000) .......... 24

*United States v. Party for Socialism and Liberation New Jersey*,
2026 WL 2938869 (D.N.J. Sep. 30, 2026) .......... 23

*United States v. Rayborn*,
312 F.3d 229 (6th Cir. 2002) .......... 24

*United States v. Stewart*,
420 F.3d 1007 (9th Cir. 2005) .......... 21

*Virginia v. Black*,
538 U.S. 343 (2003) .......... 21

*Weinberg v. National Students for Justice in Palestine*,
2026 WL 184302 (C.D. Cal. Jan. 20, 2026) .......... 16, 26, 27, 29

*White Hat v. Murrill*,
141 F.4th 590 (5th Cir. 2025) .......... 17

*Zamani v. Carnes*,
491 F.3d 990 (9th Cir. 2007) .......... 18

*Zhang Jingrong v. Chinese Anti-Cult World All.*,
314 F. Supp. 3d 420 (E.D.N.Y. 2018) .......... 24

**Statutes**

18 U.S.C. § 248 .......... *passim*

42 U.S.C. § 1981 .......... 14, 27

42 U.S.C. § 1985(3) .......... 14, 26

Cal. Civ. Code § 14 .......... 28

Cal. Civ. Code § 51.7 .......... 14, 29

Cal. Civ. Code § 52 .......... 28

Cal. Civ. Code § 52.1(a) .......... 14, 29

Cal. Penal Code § 423.1 .......... 28

Cal. Penal Code § 423.2 .......... 14, 18, 28

**Other Authorities**

Fed. R. Civ. Pro. 12(b)(6) .......... 15

## I. INTRODUCTION

Reedy's motion opens with a tribute to "uninhibited, robust, and wide-open" public debate. But this case is *not* about debate. It is about a synagogue—the oldest in Los Angeles—and the right of Jewish Angelenos to enter it, pray in it, learn in it, and leave it without being blockaded, menaced, and trapped.

Reedy and his co-defendants did not come to the Temple to debate. They came to "shut it down." Masked in "bloc," they sealed both entrances to the campus, encircled cars with children inside, and forced the Temple's Jewish schools into lockdown. Reedy himself got past the Temple's security perimeter without registration, stationed himself on the patio outside the Symposium, pounded on the glass, and refused to leave—leaving attendees too frightened to stay and too frightened to go. Far from a "shotgun pleading," the Amended Complaint alleges specific unlawful conduct by Reedy—both individually, and as part of a conspiracy.

The law has always drawn a line between words and deeds. Reedy is free to criticize Israel, Zionism, or anyone he pleases. He is *not* free to trespass onto a house of worship, block its exits, and intimidate the people inside. That is conduct, not speech, and is forbidden by state and federal law.

## II. STATEMENT OF FACTS

### A. The Glazer Campus Is a Synagogue Campus Where Prayer, Study, and Jewish Day Schools Share Gated Entrances.

Wilshire Boulevard Temple is the oldest synagogue in Los Angeles and is home to a congregation of Jewish members and guests who practice the Jewish faith there. First Am. Compl. ¶¶ 14, 100, ECF 51 (hereinafter, "FAC").

The Temple's Glazer Campus houses the sanctuary, a social service center, and two Jewish day schools. It is protected by a common security barrier with a single gated entrance on Wilshire Boulevard and private gated entrance to a parking garage on Hobart Boulevard. Within the campus is also the Irmas Pavilion—a sacred religious space—used for events that are consistent with the Temple's religious mission. *Id.* ¶¶ 37–39.

The Temple scheduled an event in Irmas Pavilion for the local Jewish and Korean-American communities called "Innovating Safety, Empowering Communities: A Symposium on AI and Public Safety." *Id.* ¶ 3. The Symposium, set for December 3, 2025, was an exercise of Jewish religious practice. *Id.* ¶¶ 44–45. Due to the dramatic increase in violent attacks on Jewish houses of worship, attendance was by invitation only. *Id.* ¶¶ 30, 40. Each guest had to preregister and was advised that security officers would check identification at the door. *Id.* ¶ 40.

**B. Reedy and Defendants Summoned a Masked Crowd to "Shut Down" the Temple.**

Defendants[1] began a coordinated effort to force cancellation of the Symposium two days before it was set to occur. They published on social media the contact information of Temple personnel, leading to a succession of calls and emails demanding the event be cancelled. *Id.* ¶ 63. When their doxing and spam calls failed, Defendants escalated their efforts.

The day before the Symposium, the Defendant Organizations called for their members to "wear bloc" (helmets, masks, goggles and dark clothing) and meet at the Temple at 8:00 a.m. the next day to "shut it down," an unmistakable call to physically shut down the event. *Id.* ¶ 6. Defendant Koreatown 4 Palestine posted the Symposium flyer overlaid with an inverted red triangle, a symbol of Hamas that reflects support for violence against Jews:

[1] Turtle Island Liberation Front, Koreatown 4 Palestine, People's City Council, Quyen Ballagh, Audrey Carroll, Ray Corpus, Jason Reedy, and John Does.




Defendant People's City Council ("PCC") "liked" the post and reposted its first screen on its own Instagram account. It then reposted the call to action to its 91,000 followers on X, exclaiming "LET'S SHUT THIS DOWN!!!" *Id.* ¶¶ 67–68.

None of this was out of character for PCC. The organization has a record of targeting Jewish houses of worship and community institutions in Los Angeles with violent demonstrations that intimidate and obstruct Jewish Angelenos from practicing their faith. PCC organized violent mobs that obstructed the Museum of Tolerance in November 2023 and again at the Adas Torah synagogue in June 2024. Jewish community members were assaulted at both protests. *Id.* ¶ 50.

Reedy helped organize PCC's effort to shut down the Symposium. *Id.* ¶ 24. He's a leader of PCC and architect of its intimidation tactics, which include so-called "staggered obstructions." Reedy has a long, documented history of engaging in this conduct, often with an infant strapped to his chest. He endorses violence, including through the use of an

inverted red triangle in the title of his social media account. *Id.* ¶¶ 49–52. Reedy and Defendants Blockaded the Temple and Followed PCC's Playbook.

Heeding Defendant Organizations' instructions, masked individuals began blockading the Temple's security gate on Wilshire Boulevard on December 3, 2025 at 8:00 a.m. They formed a barricade and confronted congregants and community members, obstructing their access to and from the Temple:




*Id.* ¶¶ 39, 72.

Defendants then closed off the Glazer Campus's other access point. At 9:15 a.m., thirty Defendants moved to the Hobart Boulevard entrance, blocked the driveway, and encircled cars. They blocked upwards of forty cars for nearly an hour with parents and children trapped inside, while refusing police instructions to disperse. Those caught in the blockade were surrounded and threatened. Coalition Members No. 1 and 2 were separately

encircled by masked Defendants who screamed hateful slurs and profanities at them.[2] *Id.* ¶¶ 73–77.

The blockade disrupted all the Temple's activities that day. Children were turned away from the Temple's day schools, which were forced into lockdown, and the social service center was forced to close. The start of the Symposium was delayed. *Id.* ¶¶ 78–79, 92.

Once the Symposium started, Defendants executed Reedy and PCC's "staggered disruption" playbook, in which participants "pop off in different parts of the room" to "[m]ake it difficult to carry on." Individual Defendants, who had registered for the program under false pretenses and with the sole intention of causing disruptions, began jumping to their feet in seriatim, while shouting threats. *Id.* ¶ 49, 80. Defendant Corpus smashed a large glass vase—sending shards past Coalition Member No. 2's leg and causing Member No. 1 to fear that a bomb had exploded—and then charged the Israeli Consul General and kicked over the sound system. Another Defendant committed a battery by spitting on Temple security guards. *Id.* ¶¶ 10, 84.

[2] Plaintiff Louis D. Brandeis Center Coalition to Combat Anti-Semitism is a membership organization. Its members include Temple members, day school parents, and persons who were obstructed when attempting to attend the Symposium. FAC ¶ 15.

### C. Reedy Entered Without Permission, Pounded on the Glass, Blocked the Patio Exit, and Refused to Leave.

Meanwhile, Reedy trespassed onto the Temple's property, took up a position on a patio just outside the room in which the Symposium was held (separated from the attendees only by a glass wall), disrupted the program, and intimidated attendees. With an infant strapped to his chest and another child in a stroller, he stalked along the glass doors and surrounding glass walls, screamed at attendees, pounded on the glass, and used his cellphone to record attendees. Both children appeared in distress, crying loudly:





*Id.* ¶ 86.

Reedy refused instructions to leave. His unlawful presence—he neither registered for the Symposium nor had he sought or been granted permission to enter the Glazer Campus—precluded attendees from exiting the Symposium room. *Id.* ¶ 87.

Reedy's conduct was coordinated with the other Defendants and achieved its goal of causing intimidation, fear, and anxiety among Temple members, guests, and employees. Coalition Member No. 1, for example, felt trapped in the Symposium room. She was frightened to remain, anxious that demonstrators intent on violence might still be inside.

*Id.* But with Reedy's menacing conduct from the patio, on the other side of the glass, she felt too frightened to leave. Coalition Member No. 2 has not returned to the Temple because of her experience that day. *Id.* ¶¶ 88–91.

## III. PROCEDURAL HISTORY

The Temple and the Coalition brought this action against Reedy, PCC, and other organizations and individuals to hold them responsible for the coordinated attack culminating on December 3, 2025. Plaintiffs allege eleven counts:

- <u>Counts I–III:</u> Freedom of Access to Clinic Entrances Act (the "FACE Act"), 18 U.S.C. § 248(a)
- <u>Count IV:</u> Conspiracy to Deprive Civil Rights, 42 U.S.C. § 1985(3)
- <u>Count V:</u> Denial of Benefits of Law on Account of Race, 42 U.S.C. § 1981
- <u>Counts VI–VIII:</u> California Freedom of Access to Clinic and Church Entrances Act (the "CA FACCE Act"), Cal. Penal Code § 423.2
- <u>Count IX:</u> Ralph Civil Rights Act, Cal. Civil Code § 51.7
- <u>Count X:</u> Bane Civil Rights Act, Cal. Civil Code § 52.1
- <u>Count XI:</u> Trespass

FAC ¶¶ 93–215.

Reedy moved to dismiss the Amended Complaint, arguing that the Temple and Coalition lack standing and have failed to state plausible claims. Mot. to Dismiss, ECF 59. Plaintiffs file this opposition in response.

## IV. LEGAL STANDARD

In determining a motion to dismiss for lack of standing and failure to state a claim, all allegations set forth in the complaint "are taken as true and construed in the light most favorable to Plaintiffs." *Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996). "Factual challenges to a plaintiff's complaint have no bearing on the legal

sufficiency of the allegations under Rule 12(b)(6)." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Review is limited to the Amended Complaint.[3]

## V. ARGUMENT

Each of Reedy's arguments fails. The Temple and Coalition have standing and more than plausibly stated claims under federal and state law. His motion to dismiss should be denied.

### A. Plaintiffs Have Standing to Seek Injunctive Relief.

"The three well-known irreducible constitutional minima of standing are injury-in-fact, causation, and redressability." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (citation modified). "A plaintiff must demonstrate constitutional standing separately for each form of relief requested." *Id.*

Plaintiffs satisfy each standing element. They face a concrete and substantial risk that Reedy will target them again and continue to suffer the effects of his misconduct. Reedy disputes only injury-in-fact, contending the Plaintiffs' allegations of future harm are too speculative. Mot. at 8. Both Ninth Circuit law and the Amended Complaint show otherwise.

The Ninth Circuit has explained that plaintiffs have standing to seek injunctive relief when a defendant has "engaged in a pattern of conduct that had persisted" because that past behavior demonstrates that, absent injunctive relief, the defendant's wrongdoing will likely continue unabated. *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020). "[T]he possibility of recurring injury ceases to be speculative when actual repeated incidents are documented." *Id.* Likewise, defendants' "failure to disavow" wrongful acts shows a likelihood of reoccurrence justifying injunctive relief. *Frankel v. Regents of Univ. of Cal.*, 744 F. Supp. 3d 1015, 1023 (C.D. Cal. 2024).

---

[3] The Court should disregard extrinsic materials referenced in Reedy's motion because they "only serve to dispute facts stated in a well-pleaded complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018).

The Amended Complaint documents Reedy's record of targeting Jewish people and institutions, leaving no doubt that Plaintiffs face a substantial risk he will target them again. Reedy "is a leader of PCC and architect of its intimidation tactics," including its "record of targeting Jewish houses of worship and community institutions in Los Angeles for violent demonstrations that intimidate and obstruct Jewish Angelenos from gathering with fellow congregants and practicing their faith." FAC ¶¶ 50–51 (detailing Museum of Tolerance and Adas Torah attacks). His history of disruption extends to the L.A. City Council and Police Commission, which he regularly obstructs "often with an infant child strapped to his chest." *Id.* ¶ 52. He has never disavowed this unlawful conduct and has persisted in it even after the December 3, 2025 violence at the Temple. FAC ¶¶ 69, 82 n.33. Absent relief, he will likely engage in it again.

Reedy's insistence that Plaintiffs lack standing unless they "allege that they will hold another objectionable event" that he will unlawfully obstruct, Mot. at 8, turns Article III on its head. Under his rule, the Temple must first commit to hosting programming he will again disrupt, before the Court may even consider restraining his illegal conduct. That standard ignores that his intimidation may have already deterred the Temple from holding such events—which is evidence of ongoing harm, not its absence. The Symposium advanced the Temple's core religious mission of *tikkun olam* (repairing the world), FAC ¶ 41, and the Temple has a constitutionally protected right to pursue its religious mission as it sees fit—not merely when Reedy approves of them.

Plaintiffs have standing to pursue injunctive relief because they continue to suffer from Reedy's unlawful behavior. Courts regularly find that "[c]ontinuing present adverse effects" from "past exposure to illegal conduct" are a basis for injunctive relief. *See, e.g.*, *Dickinson v. Trump*, 827 F. Supp. 3d 1375, 1394 (D. Or. 2026). This Court explained in *Weinberg v. National Students for Justice in Palestine*, that "[c]hoosing to avoid an area one previously frequented based on a fear of experiencing violence is a personal, actual injury sufficient to support Article III standing." 2026 WL 184302, at *5 (C.D. Cal. Jan. 20, 2026). Coalition Member No. 2 has done just that. Traumatized by Reedy's unlawful

conduct on December 3, 2025, she "has not returned to the Temple because of her experience." FAC ¶ 91. Moreover, because the coordinated attack on the Temple evaded its already expensive security measures, the Temple is now forced to spend even more on security. *See* FAC ¶¶ 34, 59–62. The resources the Temple must divert from core religious life to necessary security measures is an effective tax on its congregants' right to live and practice their Jewish faith. *Id.* ¶ 35.

Reedy wrongly asserts that three out-of-circuit cases where the plaintiffs lacked standing are "similar" to this case. Mot. at 8 (citing *Elend v. Basham*, 471 F.3d 1199 (11th Cir. 2006); *Marcavage v. City of New York*, 689 F.3d 98 (2d Cir. 2012); *White Hat v. Murrill*, 141 F.4th 590 (5th Cir. 2025)). Not so. In each, the plaintiffs—not the defendants—were the protesters. Those plaintiffs lacked standing to seek injunctive relief because it was unclear if they would again engage in the protected activity the defendants had obstructed. *See, e.g.*, *Elend*, 471 F.3d at 1206–09 ("entirely conjectural"). Standing cannot rest on "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992). But Plaintiffs' intentions here are as concrete as can be. The Temple will continue doing what it has done for its entire 160-year history: hold Jewish prayer services at fixed, weekly times. FAC ¶¶ 100–01. Likewise, its two Jewish schools will continue to hold daily "*tefillah* (prayer), weekly Shabbat services, and religious holiday observances." *Id.* ¶ 38. The conjecture that defeated standing in Reedy's cases is wholly absent here.

## B. The Amended Complaint States a FACE Act Claim.

The Amended Complaint asserts two FACE Act claims against Reedy. FAC ¶¶ 93–128. The FACE Act prohibits:

> (i) threats of force, force, or physical obstruction
> (ii) that is intended or does
> (iii) intimidate or interfere with a person lawfully seeking to exercise the right of religious freedom

(iv) at a place of religious worship.

18 U.S.C. § 248(a)(2). The Amended Complaint also asserts two claims under California counterpart to the FACE Act, California Penal Code § 423.2, which tracks its federal analog. All four claims rest on Reedy's actions, as well as the foreseeable acts of his coconspirators.

1. <u>The Amended Complaint Alleges Prohibited Conduct at a "Place of Religious Worship."</u>

A place of religious worship is "a space devoted primarily to religious worship activity—that is, anywhere that religious adherents collectively recognize or religious leadership designates as a place primarily to gather for or to hold religious worship activities." *Jingrong v. Chinese Anti-Cult World All.*, 16 F.4th 47, 49, 57 (2d Cir. 2021). A place of worship can serve other purposes too, as long as its primary purpose is religious worship activities. The Second Circuit has explained that the FACE Act protects individuals at the "property of a place of religious worship" as well as "*in the vicinity of such places*." *Id.* at 59.

Reedy argues that the Irmas Pavilion does not constitute a "place of worship." Mot. at 9–10. But the Amended Complaint alleges that the Temple's unified Glazer Campus is a place of worship, a point Reedy does not challenge and therefore waives. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

For generations, the Temple has been a center of spirituality for the practice of Jewish faith. FAC ¶ 100. Its single unified campus—including its Sanctuary, two schools, and Irmas Pavilion—"is protected by a common security barrier" with a "single gated entrance." FAC ¶ 39. The campus hosts religious prayer services, pastoral services, lifecycle events, and classes, as well as a social services center where congregants fulfill the foundational Jewish obligation of *tikkun olam*. FAC ¶¶ 100-01.

On the day of the Symposium, "the Temple's [two] Jewish day schools were in session. The Irmas Pavilion's library and study halls were open for individual and

partnered Jewish learning and reflection. In addition, the Sanctuary adjacent to the Irmas Pavilion was open for prayer and reflection." *Id.* ¶ 103. Reedy and his coconspirators blockaded both campus entrances and threatened force against people attempting to enter. *Id.* ¶¶ 72–78. Their actions were not focused solely on Symposium attendees—on the contrary, masked coconspirators blocked the Temple's garage and surrounded cars of parents trying to drop their children off at school, where their children are taught Jewish values and rituals. Defendants' actions forced some students to return home. *Id.* ¶ 78.

Independent of the Temple's status as a place of worship, the Amended Complaint also pleads that the Irmas Pavilion itself is a place of worship. Reedy likens the Pavilion to the temporary sidewalk tables in *Jingrong* that the court held were not "a place whose primary purpose is religious worship." Mot. at 9. But unlike those temporary tables, the Irmas Pavilion is permanent, sits on the Temple's campus immediately next to the Sanctuary, and is recognized by the Temple and congregation as "a sacred space ***within*** the Temple." FAC ¶ 37 (emphasis added). The Pavilion hosts communal prayer, Shabbat services, High Holy Day services (the holiest days of the Jewish year), as well as Jewish lifecycle observances including bar mitzvahs and weddings. *Id.*

Reedy's claim "that the Pavilion's primary purpose is not religious worship" turns on brazen misstatements of Amended Complaint's allegations. For example, he claims that the Pavilion's "stated primary purpose is as an event space that the Temple rents to third parties for non-worship events." Mot. at 10. But the Amended Complaint nowhere states that. On the contrary, the Amended Complaint alleges that, in addition to using it for communal prayer, "[t]he Temple rents space at the Irmas Pavilion for events and affairs that are consistent with the Temple's religious mission and values," including Jewish weddings and bar mitzvahs. FAC ¶ 37. Nor does the Amended Complaint allege, as Reedy represents, that the Pavilion is used only "sometimes" for Jewish observances. Mot. at 10.

Finally, Reedy contends that social action "rooted in religious belief does not transform the public spaces where the action occurs into 'places of religious worship.'" Mot. at 10 (quoting *Jingrong*, 16 F.4th at 62). But the "public spaces" in *Jingrong* were

temporary tables on *public* sidewalks. In contrast, the Irmas Pavilion is *privately* owned, on the Temple's *private* property. The fact is, religious institutions of all kinds, including churches, synagogues, and mosques, often house auxiliary gathering spaces in addition to their primary worship spaces, such as sanctuaries and prayer halls. Reedy's argument asks the Court to immunize those who obstruct access to the grounds of a religious institution on the pretext that a non-religious event (as they define it) may be occurring outside the interior walls of a dedicated holy space. That is not the law.

2. The Amended Complaint Pleads Exercise of Religious Freedom.

Reedy argues that, at the time of his trespass onto the Temple's property, nobody was seeking to exercise the right of religious freedom. Mot. at 9–10. But the Amended Complaint alleges that the Temple agreed to host the Symposium because it furthered a core component of the Temple's religious mission. The Temple's Senior Rabbi Joel Nickerson opened the program with a prayer, invoked the Jewish religious obligation of *tikkun olam,* and emphasized that the Symposium was an exercise of Jewish religious practice. FAC ¶¶ 41, 45.

Moreover, the Amended Complaint alleges—and Reedy doesn't dispute—that his actions and those of his coconspirators interfered with people seeking to exercise religious freedom in other ways, including the families blocked from entering the parking garage for drop-off at the Temple's Jewish schools. *See Mahmoud v. Taylor,* 606 U.S. 522, 547 (2025) (Constitution protects "the practice of educating one's children in one's religious beliefs," including "a parent's decision to send his or her child to a private religious school").

3. Reedy Used Threats of Force and Physical Obstruction.

Under the FACE Act, a threat of force, known as a true threat, is an expression reasonably understood to communicate a serious intent to inflict bodily harm. *Planned Parenthood of Columbia/Willamette v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1078 (9th Cir. 2002). Courts consider "the whole factual context" to determine "whether a statement is a true threat." *Id.* A threat need not be explicit—the "fact that a threat is subtle

does not make it less of a threat." *Id.* at 1075. A symbol alone, based on context, may constitute a true threat. *Virginia v. Black*, 538 U.S. 343, 360 (2003) (burning cross often true threat); *United States v. Hart*, 212 F.3d 1067, 1072 (8th Cir. 2000) (parking trucks near reproductive clinic, recalling Oklahoma City bombing, was true threat). Moreover, defendants "need not actually intend to carry out the threat," *Black*, 538 U.S. at 359–60, nor subjectively intend to communicate an intent to inflict bodily harm, *Counterman v. Colorado*, 600 U.S. 66 (2023). The threat need not be communicated to, or even seen by, the victim. *United States v. Stewart*, 420 F.3d 1007, 1018 (9th Cir. 2005). Rather, defendants are liable for making a true threat whenever they exhibit a conscious disregard of a substantial risk that their statement would be viewed as threatening violence. *Counterman*, 600 U.S. at 66.

For example, in *Helmann v. CodePink Women for Peace*, Judge Wilson denied a motion to dismiss a FACE Act claim alleging a threat of force based on a single social media post announcing a protest at a synagogue. 2025 WL 3030582, at *16 (C.D. Cal. June 13, 2025). The post included the event date and synagogue address inside an inverted red triangle, which the plaintiff alleged was a Hamas symbol used to target Jews for violence. Judge Wilson held that the "use of the inverted red triangle, as alleged, plausibly constitutes a true threat." *Id.* at *12.

Reedy argues that the Amended Complaint fails to plausibly allege threats of force. But he ignores allegations that he trespassed onto private property that was protected by a security barrier and guards, stationed himself on a patio with only glass separating him from the frightened Symposium attendees, pounded on that glass, screamed at attendees, refused directions to leave, and prevented egress for an extended period. The Amended Complaint also alleges that Reedy is liable for the acts of his coconspirators in furtherance of a conspiracy to use threats of force. For example:

- Corpus smashed a glass vase causing a Coalition member to fear an explosion, then charged a Symposium guest;

- Masked defendants surrounded the cars of Symposium attendees and parents trying to drop off children at school and screamed slurs and obscenities at them; and

- Another defendant accosted a parent trying to enter the Temple's security gate and threatened to "fuck [him] up."

FAC ¶¶ 75–83. Reedy does not contest these allegations plead threats of force.

Reedy's actions parallel the conduct in *Femhealth USA, Inc. v. Nelson*, 2025 WL 479394 (M.D. Tenn. Jan. 13, 2025). There, protestors stood on the opposite side of a glass door entrance to a reproductive health clinic, yelled at clinic staff, banged on the door, and cursed the staff and patients. The court held the protestors' actions constituted a threat of force and entered summary judgment in favor of the clinic on its FACE Act claim. *Id.* at *1–5.

The Amended Complaint also pleads that Reedy engaged in physical obstruction. Under the FACE Act, physical obstruction includes "rendering passage to or from . . . a place of religious worship unreasonably difficult or hazardous." 18 U.S.C. § 248(e)(4). Reedy argues that Plaintiffs have not alleged that he made any exit "actually impassable." Mot at 11. But the FACE Act "does not limit physical obstruction to bodily obstruction," rather it "is broadly phrased to prohibit any act rendering passage to the facility unreasonably difficult." *United States v. Mahoney*, 247 F.3d 279, 284 (D.C. Cir. 2001); *see also New York ex rel. Spitzer v. Cain,* 418 F. Supp. 2d 457, 480 (S. D. N. Y. 2006) (demonstrating close to clinic entrance compelling patients to use alternate door); *United States v. Dugan*, 450 F. App'x 20, 22 (2d Cir. 2011) (kneeling in front of entrance).

Reedy's trespass and occupation of the patio, together with his pounding on the glass and screaming at attendees, refusal to leave when directed, and immediate proximity to the only door to the outdoor patio, constitutes physical obstruction. Moreover, the Amended Complaint alleges that Reedy and his coconspirators conspired to obstruct access to and from the Temple campus as a whole. The Amended Complaint pleads physical obstruction.

4. The FACE Act Does Not Require Intent to Interfere with Religious Freedom.

Reedy asserts that the Amended Complaint fails to allege his speech was ***intentionally*** directed at "injuring, intimidating, or interfering with [another's] exercise or attempted exercise of religion.'" Mot. at 13–14, (citing *United States v. Party for Socialism and Liberation New Jersey*, 2026 WL 2938869 (D.N.J. Sep. 30, 2026)). But that is not an element of the claim.

The court in *Party for Socialism* expressly held that intent to interfere with religious freedom is ***not*** an element of a Section 248(a)(2) FACE Act claim. The court compared FACE Act Sections 248(a)(1) and 248(a)(2). Section 248(a)(1) prohibits actions "to injure, intimidate, interfere or attempts to injure, intimidate or interfere with any person ***because that person is*** . . . obtaining or providing reproductive health services." Section 248(a)(2), by contrast, omits the term "because" and prohibits actions "to injure, intimidate or interfere ***with any person lawfully exercising or seeking to exercise the First Amendment right*** of religious freedom." The omission of the term "because" means that a defendant who injures, intimidates or interferes with another person may be held liable whether or not he knew that other person was seeking to exercise religious freedom. *Party for Socialism*, 2026 WL 2938869 at *5 n.2.

In any event, the Amended Complaint clearly alleges that Reedy and his coconspirators purposefully intended to intimidate and obstruct people seeking to exercise freedom of religion, including the attendees of the Symposium seeking to perform the religious obligation of *tikkun olam* and parents trying to educate their children in the Jewish day school. FAC ¶ 120–22.

5. The FACE Act is Constitutional.

Reedy argues that the FACE Act exceeds Congress's Commerce Clause authority. Mot. at 8–9. But he cites no decision, in any circuit, ruling as much. His argument rests instead on a single concurrence in *Jingrong*, on an issue the majority expressly declined to consider. 16 F.4th at 62–63.

Congress's power under the Commerce Clause "includes the power to regulate those activities having a substantial relation to interstate commerce." *United States v. Morrison,* 529 U.S. 598, 609 (2000). Congress's authority extends to purely local activities that have a substantial effect on interstate commerce. *Gonzales v. Raich*, 545 U.S. 1, 17 (2005) (home-grown cannabis for personal consumption). On review, the Court's task is "modest": a statute must be upheld if there's a "rational basis" to conclude the activities at issue, in the aggregate, substantially affect interstate commerce. *Id.* at 22.

The district court in *Jingrong* held that the FACE Act was constitutional. *Zhang Jingrong v. Chinese Anti-Cult World All.*, 314 F. Supp. 3d 420, 423–24 (E.D.N.Y. 2018). It noted that 20% of Americans attend weekly religious services, and church contributions represent 1% of U.S. gross national product. The court also explained that congregations generate $74.5 billion in annual revenue, employ nearly 200,000 people, and provide an array of commercial services—not only to congregants but communities at large. The Court thus found a rational basis to conclude that the free exercise of religion at houses of worship substantially affects interstate commerce. *Id.* The court in *New Beginnings Ministries v. George*, 2018 WL 11378829 (S.D. Ohio Sept. 28, 2018), held similarly. It concluded that "violence and intimidation at places of religious worship can deter people from participating in religious-based, commercial activity." *Id.* at *7; *see also United States v. Rayborn,* 312 F.3d 229, 233 (6th Cir. 2002) ("churches can and do engage in commerce").

Like the plaintiffs in *Jingrong* and *New Beginnings*, the Temple engages in religious activities that affect interstate commerce. FAC ¶ 38 (Jewish day schools), ¶¶ 43, 92 (social service and food panty distribution centers), ¶ 37 (event rentals). The FACE Act is constitutional.

6. <u>The FACE Act Permits Conspiracy Liability, and the Amended Complaint Alleges Reedy Joined the Conspiracy.</u>

In addition to Reedy personally committing every element necessary for liability under the FACE Act, he's also liable because he participated in a conspiracy to violate the

Act. Section 248 reaches "***whoever***" makes access to or from a house of worship "unreasonably difficult or hazardous." 18 U.S.C. § 248. This plainly includes those conspiring with one another.

Courts consistently permit FACE Act liability based on conspiracy. In *Planned Parenthood*, the en banc Ninth Circuit approved injunctive relief against defendants who conspired to violate the Act by printing threatening posters because each "either participated in making them, or agreed that they should be made." 290 F.3d at 1082. Other federal courts have ruled similarly, including in cases with facts closely paralleling this action. In *FemHealth v. Williams*, for example, "ten to twenty" members of Operation Save America stood in front of a reproductive health clinic's entrance while more "members and affiliates gathered on the streets and sidewalks" nearby. 2022 WL 4241269, at *2 (M.D. Tenn. Sep. 14, 2022). The court didn't analyze the activities of all eleven defendants individually but instead granted an injunction against all of them because they had acted in concert to violate the FACE Act. *Id.* at *4–5.

The Amended Complaint likewise alleges that Defendants conspired to violate the FACE Act. PCC and its leadership—Reedy foremost among them—coordinated with other groups to organize the attack on the Temple. They executed a "multi-stage plan." FAC ¶ 5. They began by issuing joint social media posts, calling their members and followers to action. They directed demonstrators to "wear bloc" and obstruct access to the Temple. *Id.* ¶¶ 64–69. On the day of the attack, Defendants coordinated to ensure they obstructed both entrances to the Glazer Campus, making it difficult and hazardous for congregants and attendees to enter or leave. Meanwhile, other Defendants (like Reedy), unlawfully gained access to Temple grounds before disrupting the Symposium and trapping attendees inside. *Id.* ¶¶ 5, 70–73. Reedy's presence outside the Symposium room was made even more hazardous because attendees knew that—even if they got past Reedy unharmed—they'd still have to traverse a gauntlet of his coconspirators to exit the Glazer Campus. And inside the Symposium room itself, Defendants followed the PCC

"playbook" for disrupting events: "staggered disruptions" in which demonstrators "pop off in different parts of the room" that make the event "difficult to carry on." *Id.* ¶ 80.

Reedy improperly construes Plaintiffs' allegations in the light most favorable to ***him***—not to Plaintiffs—by arguing this coordinated operation was mere "parallel conduct." Mot. at 15–16. But Defendants' conduct, construed in the light most favorable to Plaintiffs, was coordinated and tortious. As this Court held in another case against PCC, "joint social media posts" and a "highly organized and disciplined" demonstration support "an inference that [Defendants] entered into a conspiracy." *Weinberg*, 2026 WL 184302, at *7. Plaintiffs' conspiracy allegations are more than enough to support liability, "especially at the pleadings stage." *Id.*

### C. Section 1985(3) Reaches Private Actors Infringing Thirteenth Amendment Rights, and Plaintiffs Allege Discriminatory Animus.

Section 1985(3) deprivation claims require plaintiffs to show that (i) defendants deprived the plaintiffs of a right "protected by the Constitution against interference by private action" and (ii) "discriminatory animus" lay behind the defendants' conduct. *Weinberg*, 2026 WL 184302, at *6–7. Plaintiffs have alleged both here.

*First*, Plaintiffs allege deprivation of their Thirteenth Amendment rights to freedom from racial violence and freedom of travel. FAC ¶ 146. As this Court explained in *Weinberg*, those rights are "actionable under Section 1985(3)" when infringed by private actors. 2026 WL 184302, at *7.

*Second*, Plaintiffs allege that Defendants' conduct was "borne of anti-Semitic animus" and undertaken "in order to discriminate against Jewish People." FAC ¶¶ 140, 144. Those allegations are backed by specific facts. Defendants' conduct targeted ***a synagogue***, the very "center of Jewish communal and religious life." *Id.* ¶ 147. Reedy and his coconspirators orchestrated a sophisticated, multi-phased campaign targeting both particular Jewish individuals seeking to enter the synagogue and Jewish people more generally—as the attack "impacted all of the Temple's activities." *Id.* ¶¶ 77–78.

Reedy pointlessly sheds ink arguing that anti-Zionism is distinct from antisemitism. But he acknowledges that courts "*have* found antisemitic intent adequately pleaded" when the "alleged conduct unambiguously target[ed] Jewish people." Mot. at 17–18. That is precisely what occurred here: Defendants blocked scores of Jewish people from entering a Jewish house of worship. The "sheer volume" of anti-Jewish exclusion far exceeds that in the handful of out-of-jurisdiction cases that Reedy cherry-picks. *Weinberg*, 2026 WL 184302, at *9 (distinguishing *Stand With US Ctr. for Legal Just. v. MIT*, 158 F.4th 1 (1st Cir. 2025)).

**D. Section 1981 Claims Reach Private Conduct.**

Section 1981's plain text unambiguously covers "impairment by nongovernmental discrimination." *Chapman v. Higbee Co.*, 319 F.3d 825, 829–30 (6th Cir. 2003) (en banc). Indeed, the majority view among circuits is that "the face of the amended statute" makes clear that no "state action is required." *Phillip v. Univ. of Rochester*, 316 F.3d 291, 294 (2d Cir. 2003).

Ninth Circuit courts agree. They've repeatedly held that "the plain language" of the statute unquestionably protects against "private discrimination" and that "the Ninth Circuit would reach the same conclusion." *See, e.g.*, *Mbacke v. Federated Department Stores, Inc.*, 2008 WL 11449290, at *4 (D. Nev. Dec. 15, 2008); *My Future Consulting, Inc. v. Volt Mgmt. Corp.*, 2022 WL 2189504, at *4 (C.D. Cal. Mar. 17, 2022) (same).

Section 1981 reaches Reedy's conduct. He purposefully targeted the Temple to discriminate against Jewish people. He and his coconspirators trespassed onto the Glazer Campus and then vandalized Temple property. FAC ¶ 155. They kicked over part of the Temple's sound system and shattered a large vase, sending glass shards past Coalition Member No. 2's leg. *Id.* ¶ 83. Plaintiffs' Section 1981 claims are well-pled and should not be dismissed.

**E. The State-Law Claims Are Properly Pleaded.**

1. The Temple May Sue Under the Ralph Act.

Reedy wrongly maintains that only natural persons may sue under the Ralph Act. Mot. at 20. His argument ignores not only California precedent, *see, e.g.*, *J. R. Norton Co. v. Gen. Teamsters, Warehousemen & Helpers Union*, 256 Cal. Rptr. 246 (Ct. App. 1989), but also the statutory text. The Ralph Act grants a right of action to "any ***person*** aggrieved" by the alleged misconduct, and "the word person includes a corporation." Cal. Civ. Code §§ 14(a), 52(c) (emphasis added).

Reedy's only contrary authority is a case under the Unruh Act—not the Ralph Act. *Midpeninsula Citizens for Fair Hous. v. Westwood Invs.*, 271 Cal. Rptr. 99 (Ct. App. 1990) (distinguishing claims not "brought under the Unruh Act"). The "Ralph Act is not part of the Unruh Act," and "there are significant differences between" the statutes. *Stamps v. Superior Ct.*, 39 Cal. Rptr. 3d 706, 714 (2006). And moreover, *Midpeninsula*'s holding was limited to organizational plaintiffs that, unlike the Temple, were not "itself damaged" or "the victim." 271 Cal. Rptr. at 103–04.

2. The Amended Complaint Alleges CA FACCE Act Claims.

Reedy offers no independent argument concerning the CA FACCE Act claims. He simply asserts the statute requires "a crime of violence" and that Plaintiffs' claims under it "fail for the same reason their federal FACE claims do." Mot. at 20.

But Plaintiffs have properly alleged CA FAACE Act claims, just as they have properly alleged claims under the federal analog. *Supra* § IV.B The CA FAACE Act imposes liability on anyone who intimidates or interferes with religious exercise at a place of worship not just by a "crime of violence" but, like its federal counterpart, also by "nonviolent" physical obstruction. Cal. Penal Code § 423.2(b), (d). Reedy did that by stalking the glass doors, while screaming at and recording Symposium participants. FAC ¶¶ 86, 179. And regardless he and his coconspirators engaged in actions that are crimes of violence, defined as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another." Cal. Penal Code

§ 423.1(a). Reedy's coconspirators foreseeably committed (and were arrested and charged with) crimes of violence, including vandalism for smashing a glass vase owned by the Temple and battery for spitting on security guards. Reedy himself unlawfully trespassed onto Temple property and violently "pounded on the sliding glass doors and walls of the Irmas Pavilion, menacing attendees." FAC ¶¶ 10, 84, 172. Plaintiffs have plainly alleged CA FAACE Act claims through both nonviolent physical obstruction and through threats of force and physical obstruction that are crimes of violence.

3. <u>The Ralph and Bane Act Claims Rest on Conduct, Not Speech.</u>

Reedy's arguments against the Ralph and Bane Act claims are based on the mistaken belief that they target his "speech alone" and that his conduct did not interfere with rights protected from infringement by a "private party." Mot. at 20–21. He's wrong.

The claims are based on his *conduct*. The Ralph Act prohibits "violence or intimidation by threat of violence," Cal. Civ. Code § 51.7(a), and the Bane Act prohibits interference with a person's rights "by threats, intimidation, or coercion," *id.* § 52.1(a). Reedy did precisely that: Motivated by anti-Jewish sentiment, he screamed at Symposium attendees, stalked the perimeter of their meeting room, and pounded on the glass. FAC ¶ 86. This intimidating, threatening, and violent conduct "trapped" attendees—Coalition members among them. *Id.* ¶¶ 89–90. His actions curtailed, at a minimum, their Thirteenth Amendment rights to freedom of movement and freedom from racial violence, both of which apply to private actors. *See Weinberg*, 2026 WL 184302, at *7.

4. <u>Reedy Trespassed on Temple Property.</u>

Reedy's trespass arguments lack a factual foundation. He insists he entered the Temple's grounds with "consent," stayed within the "scope of permission granted," and acted with "reasonable promptness and in a reasonable manner" when asked to leave. Mot. at 21–22. The Amended Complaint supports none of this.

Reedy trespassed through his "unauthorized entry" onto the Temple's property. *Civic W. Corp. v. Zila Indus., Inc.*, 135 Cal. Rptr. 915, 925 (Ct. App. 1977). As the Amended Complaint alleges: "Reedy did not register for the Symposium at all. He never

sought permission to enter the Temple's campus, and none was given." FAC ¶ 61. Even with permission to enter, Reedy would be liable for trespass because once on Temple property he acted "hostile to the interests" of the Temple by banging on walls and screaming at Symposium attendees. *Cassinos v. Union Oil Co.*, 18 Cal. Rptr. 2d 574, 578–79 (1993). This conduct was plainly not within the scope of any permission to enter. Reedy makes the outrageous assertion that this behavior was merely a "discussion or free interchange of ideas." Mot. at 22. But he was there for one express reason: "to 'shut down' the Symposium." FAC ¶ 80. And nothing in the Amended Complaint supports his argument that he acted with "reasonable promptness" to leave the Temple when asked. On the contrary, he "refused instructions to leave." FAC ¶ 87. The Temple has stated a trespass claim.

## VI. CONCLUSION

Plaintiffs respectfully request that the Court deny Reedy's motion to dismiss in its entirety. Should the Court grant the motion in any respect, however, Plaintiffs respectfully request dismissal be without prejudice and with leave to amend. *See Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996).

DATED: October 30, 2026

Respectfully submitted,

COVINGTON & BURLING LLP

By: */s/ Daniel N. Shallman*
Daniel N. Shallman (Bar No. 180782)
Paulina Rafizadeh (Bar No. 348706)
Mathew A. Sperling (Bar No. 360266)
1999 Avenue of the Stars
Los Angeles, California 90067-4643
Telephone: + 1 (424) 332-4800
dshallman@cov.com

THE LOUIS D. BRANDEIS CENTER FOR HUMAN RIGHTS UNDER LAW

By: */s/ Marci L. Miller*
Marci L. Miller (Bar No. 162790)
Richard Rosen (*Pro Hac Vice*)
Jeffrey I. Lang (*Pro Hac Vice*)
Mollie Galchus (*Pro Hac Vice*)
1776 I Street, NW
Washington, DC 20006
Telephone: + 1 (714) 299-7157
mmiller@brandeiscenter.com

*Attorneys for Plaintiffs Wilshire Boulevard Temple and The Louis D. Brandeis Center Coalition to Combat Anti-Semitism, Inc.*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs Wilshire Boulevard Temple and The Louis D. Brandeis Center Coalition to Combat Anti-Semitism, Inc., certifies that this brief contains 6,909 words, which complies with the word limit of L.R. 11-6.1.

DATE: October 30, 2026

*/s/ Daniel N. Shallman*
Daniel N. Shallman (Bar No. 180782)